SIXTH DIVISION

No. 1-06-0141

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| | ) | |
| | ) | No. 04 CR 11378 |
| v. | ) | |
| | ) | |
| SEDGWICK WILLIAMS, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County defendant, Sedgwick Williams, was found guilty of aggravated kidnaping (720 ILCS 5/10-2(a) (West 2002)) and sentenced to 25 years' imprisonment. On appeal, defendant contends that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred in denying his motion to quash the search warrant and to suppress evidence; (3) the trial court erred in denying his motion to dismiss the indictment; (4) the trial court abused its discretion when it found that two child witnesses were competent to testify at trial; (5) the trial court erred when it permitted Chicago police detective Robert Smith to testify regarding a photo identification by Malik Baker where the prosecutor never questioned Malik about his photo identification; and (6) the trial court erred when, at various phases of the trial, it departed from its function as a trial court and assumed the role of a prosecutor. For the reasons that follow we reverse.

1

No. 1-06-0141

## I. BACKGROUND

On May 6, 2004, defendant was charged with two separate indictments. In case No. 04 CR 11378, defendant was charged with numerous counts of aggravated kidnaping (720 ILCS 5/10-2(a)(2), (a)(6) (West 2004)) and aggravated vehicular hijacking (720 ILCS 5/18-4(a)(2), (a)(3) (West 2004)) of the victims: Anthony Baker, Liz Baker and three children under the age of 13 (Millard Baker, Malik Baker, and Erik Williams) which occurred on January 2, 2004.[1] In case No. 04 CR 1027, defendant was charged for the attempted murder (720 ILCS 5/9-1(a)(1) (West 2004)) of Anthony Baker on January 20, 2004. These two cases were joined for trial by agreement of the parties. With respect to case No. 04 CR 11378, involving the January 2, 2004, aggravated kidnaping of the Baker family, defendant was tried together with codefendants Jeffrey Campbell and Steven Williams.

---

[1]The evidence presented to the grand jury in case No. 04 CR 11378, involving the aggravated kidnaping and hijacking, consisted of the following. Detective Smith testified that on or about January 2, 2004, defendant "participated in a kidnaping." Detective Smith identified the victims of this kidnaping as Anthony Baker, his wife, Liz, and three children (Millard Baker, Malik Baker and Eric Williams). Detective Smith further stated that the "offenders" initially used handguns to hijack the vehicle in which the Baker family was seated. Detective Smith acknowledged that Liz Baker fled the scene but stated that the offenders took Anthony and the three children. Detective Smith averred that the children were ultimately released and that Anthony was "able to get out of the clutches of his kidnapers." Detective Smith finally testified that Malik Baker viewed a photo array and positively picked out defendant.

2

1. Motion to Quash the Search Warrant and to Suppress Evidence

Prior to trial, on November 18, 2004, defendant filed two pretrial motions to quash the search warrant and to suppress evidence seized from three separate searches of defendant's grandmother's house and basement.

At the hearing on that motion, on February 15, 2005, defendant's grandmother, Betty Williams, testified that she is 72 years old and lives on the second floor of her two flat at 6835 South Dorchester Street in Chicago, with her 16-year-old granddaughter Fallon, her 27-year-old grandson Torino, and defendant. Betty stated that she rents the first-floor unit, but that the basement is hers.

Betty further testified that about 11:30 p.m., on January 3, 2004, she was in her apartment with Fallon, and both of them were sleeping, when she was awakened by the persistent ringing of the doorbell. Betty got out of bed, woke up Fallon and told her to go check who was at the front door. When Fallon told Betty that the police were at the front door, Betty instructed her to see what they wanted. She stood at the top of the stairs leading down to the front door. According to Betty, when Fallon turned the knob, six officers, one in plain clothes and five in uniform then rushed into the house, up the stairs and past Betty into the second-floor apartment. Betty stated that she did not give the police permission to enter her home.

Betty further averred that when she demanded to know what was going on, an officer asked for defendant. Betty told the police that defendant was not at home and that she last saw him the day before. The police proceeded to search the house for defendant. According to Betty, the police searched the bedroom, the kitchen, the enclosed back porch, and the living room.

3

Betty also averred that she saw a police officer going through a clothes closet and another one looking through her dresser drawer.

According to Betty, at that point she heard a knock on the back door and she instructed her granddaughter to go and see who it was. Fallon indicated that "it was more police officers" who entered the house without asking for permission.

Betty also testified that the police searched the basement inside the building. She stated that she remained upstairs while they did that.

Betty also averred that none of the police officers asked her to sign a consent to search form when they initially entered the house. Instead, according to Betty, the police searched the house for about 25 minutes before an officer presented her with a consent form. According to Betty, the officer asked her to sign the consent form only after Fallon voiced her opinion that the police should not be there and that Betty should call her daughter, Alicia, who is also a police officer. Betty testified that she refused to sign the consent form because the police had already searched her house. She stated that at that point the officer said, "This house is under seizure. I'm going to find me a judge." After that, the police remained in Betty' home until about 10 a.m. on the following morning.

On cross-examination, Betty stated that she uses the basement, that it is always locked and that she holds the keys. Betty, however, acknowledged that she does allow defendant to use the basement on occasion and that she gives him the keys when he asks for them. She stated, however, that defendant did not ask her for the basement keys the day before.

4

On cross-examination, Betty also conceded that she allowed Fallon to take the officers into the basement. Betty stated that she did that after the police officers came into her house from the backdoor and stated "We need to go into the basement." According to Betty, she allowed the police into the basement because she was confused and afraid that they were going to take down the basement door if she did not allow them to go inside.

Betty also averred that she never saw any children enter the house or the basement, but conceded that she did not enter the basement on the previous night. Betty acknowledged that she did not know whether defendant went into the basement on that night or if he had kept anything there.

After defendant presented his case, the parties stipulated that after a warrant was obtained and executed, witnesses were brought onto the premises by police to view and identify the basement as the scene of the crime, and that subsequently certain evidence (including, *inter alia*, a bulletproof vest and some ammunition) was taken out of that basement.

The State called Detective Robert Smith, who testified that on January 3, 2004, he was assigned to investigate the kidnaping, and vehicular hijacking, of the Baker family. Detective Smith stated that from his investigation he learned that on January 2, 2004, three children, ages, 10, 8 and 2, were kidnaped and taken to a basement. Detective Smith testified that as a result of his investigation, he also learned that codefendant Curtis Posey was already in custody. After speaking with Posey, Detective Smith discovered that defendant was one of his "associates." Detective Smith also averred that he spoke with two of the victims, Anthony Baker and Malik Baker. He stated that after being shown a photo array, Anthony Baker identified defendant as a

drug dealer from 68th Street and Dorchester, and Malik Baker identified defendant as the man present at the scene while he was being duct taped.

Detective Smith testified that he then searched for defendant's home address and found out that he lived at 6835 South Dorchester. Detective Smith averred that at about 11:30 p.m. on January 3, 2004, he went to that residence with approximately half a dozen other officers. According to Detective Smith, upon arriving at the house, he knocked on the door and "a young lady came to greet him." Detective Smith identified himself as a detective of the Chicago police department and asked to speak to the owner of the residence. At that point, an older lady came to the door and stated that she was defendant's grandmother, Betty Williams. Detective Smith asked Betty if she knew where defendant was and she indicated that he lived there but that at the present time he was not at home.

Detective Smith averred that he then asked Betty's permission to search the house for defendant and that she permitted him to do so. After an unsuccessful cursory search of the apartment, Detective Smith asked Betty if he could search the basement. Betty gave the keys to the basement to her granddaughter Fallon, and Fallon opened the basement door for the police.

Detective Smith testified that immediately upon opening the basement door he observed a bulletproof vest, several boxes of ammunition, paint cans and plastic chairs. According to Detective Smith, during his conversation with the two minor victims, he had been told that there were paint cans and chairs in the basement where they had been taken by the kidnapers.

Detective Smith averred that he then had Millard Baker and Malik Baker brought to

Betty's basement. According to Detective Smith, when the boys entered the basement they looked around and Malik Baker pointed at the plastic chairs and stated that that was where he was seated after he was kidnaped.

After the children left, Detective Smith went to obtain a search warrant. He averred that he obtained one the following morning, at approximately 7:25 a.m.

On cross-examination, Detective Smith acknowledged that when he entered Betty's house at 11:30 p.m. he did not have a search warrant. He stated that he initially went to the house to find defendant. Detective Smith however conceded that he did not have information that defendant was at home, that he did not conduct surveillance of the home, and that he did not go to the home to check if defendant's name was on the mailbox in order to ascertain if defendant actually lived there. Detective Smith further acknowledged that he did not have any information that defendant was at the home and about to flee, and that he had no information or reason to believe that evidence that was inside that home was in danger of disappearing or being destroyed.

Detective Smith also testified that he initially went to Betty' house to arrest defendant based upon Malik Baker's photo array identification of defendant as one of the perpetrators. Detective Smith stated that the photo array was conducted in Anthony Baker's house and that it included six photographs. Detective Smith stated that defendant's photograph was placed in the photo array because he was "an associate of [codefendant] Curtis Posey." Detective Smith acknowledged that Posey never made a statement implicating defendant in the kidnaping before defendant's photograph was placed in the photo array. He, however, testified that Posey did

7

implicate defendant in the kidnaping after the photo array and before he and other detectives went to Betty's home.

Detective Smith also averred that he placed defendant's photograph in the photo array because during his investigation, he had learned that "the female who had dropped the children [who had been kidnaped] off in the 7th District [police station] was *** Crystal Long *** [who] has a relationship with [defendant.]" Detective Smith testified that he assumed that Crystal Long and defendant were dating because his investigation revealed a prior domestic battery call involving Crystal Long as the victim and defendant as the "possible offender."

On cross-examination, Detective Smith also conceded that when he initially entered Betty's home he told her that his search would be limited to finding defendant and that he would not search the premises for anything else. He indicated that he searched inside the closets and underneath the beds, but denied having gone through desk drawers or any of Betty's belongings.

In rebuttal, defendant presented the testimony of defendant's cousin and Betty's granddaughter, Fallon Williams. Fallon testified that she is 16 years old and that she lives in the second-floor apartment at 6853 South Dorchester Street with her grandmother. Fallon averred that at approximately 11:30 p.m., on January 3, 2004, her grandmother woke her up because the front doorbell was ringing. When Fallon went to the door and inquired who it was, a police officers told her, "little girl, open the door." Fallon told her grandmother that it was the police and her grandmother instructed her to open the door and see what they wanted. Fallon specifically averred that her grandmother did not give her permission to let the officers inside the home. When Fallon opened the door, six officers rushed into the apartment, without asking

8

permission to enter. Fallon stated that one officer asked for defendant and that she told him that he was not at home.

Fallon testified that about 30 minutes later, more police officers came in from the backdoor and indicated that they wanted to enter the basement and needed keys. Fallon's grandmother gave her the keys and told her to lead them to the basement.

After hearing closing arguments by defense counsel and the State, the circuit court denied defendant's motion to quash the search warrant and suppress evidence. In doing so, the circuit court specifically found that entry was proper both because the police were given consent to enter Betty's home and because there were exigent circumstances surrounding that entry, namely a "violent offense where children [were] duct taped and held secretly in this very location," and the close proximity in time between the searches and the actual crime. The court also noted that in respect to consent, it found the testimony of Detective Smith far more credible than the testimony of either Betty or Fallon Williams.

2. Motion to Quash the Indictment

On June 13, 2005, defendant filed a motion to dismiss the indictment alleging that there was no evidence presented to the grand jury that he had committed acts in furtherance of the crime charged, namely, aggravated kidnaping. In support of this contention, defendant attached a transcript of the grand jury proceedings. In arguing his motion, defendant cited to People v. Rodgers, 92 Ill. 2d 283 (1982), and contended that according to that transcript the only evidence presented to the grand jury of his involvement in the crime was the testimony of Detective Smith, who stated that defendant "participated in the kidnaping." According to defendant, there was no

9

evidence at all presented to the grand jury regarding what specific actions he took in committing that crime. Defendant also argued that the testimony elicited from Liz Baker during the grand jury proceedings revealing that she had identified defendant as the offender was relevant only with respect to case No. 04 CR 1027, involving the shooting of Anthony Baker on January 20, 2004, and not relevant to case No. 04 CR 11378, involving the kidnaping of the Baker family on January 2, 2004. As such, defendant argued that this identification was irrelevant to the indictment presented to the grand jury. The circuit court denied defendant's motion, rejecting the argument that the State failed to present some evidence that defendant did something in furtherance of the crime. In doing so the court held that "the criminal acts are talked about, albeit in a conclusory manner."

### 3. Trial Proceedings

On July 7, 2005, a simultaneous bench trial began for defendant and two other codefendants, Steven Williams and Jeffrey Campbell. In this proceeding, defendant was tried under two separate indictments for crimes occurring on two separate dates, namely, the aggravated kidnaping and aggravated vehicular hijacking of Anthony Baker, Liz Baker, Millard Baker, Malik Baker, and Erik Williams, which occurred on January 2, 2004 (case No. 04 CR 11378 ) and the attempted murder of Anthony Baker, which occurred on January 20, 2004 (case No. 04 CR 1027). Codefendants Steven Williams and Jeffrey Campbell were also tried for the aggravated kidnaping of the Baker family on January 2, 2004. The testimony that is contained and discernable from the record below is as follows.

a. Anthony Baker

Anthony Baker testified that in January 2004, he lived at 6860 South Calumet Drive in Chicago. Anthony stated that at about 7:25 p.m. on January 2, 2004, he was inside his 1995 Dodge Caravan parked across the street from his home, with his wife, Liz Baker, his two children Millard and Malik Baker, and another child, Eric Williams (known as Redman), whom Liz babysat. Anthony was sitting in the driver's seat while Liz was in the front passenger seat, and the three children were on the bench seat directly behind them. According to Anthony, at that time Millard was 10 years old, Malik was 8 years old and Eric was 2.

Anthony averred that as he was pulling out of the parking spot a van pulled up next to his car and "a bunch of people jumped out," armed with guns, circling his car. One of the armed men approached his door and told him to open it. Two other men approached Liz's window and tried to open her door. Anthony identified codefendants Jeffrey Campbell and Curtis Posey as being those two men. Anthony testified that after Campbell and Posey approached Liz's window, they went around the car to his door and ordered him to open it. Once Anthony opened the door, codefendant Campbell put a gun to his neck and ordered him to get in the back of the car.

Anthony stated that he climbed over the seats and over the children into the back of the van. Once there, he observed the men open the back doors of the car and jump inside of it. Anthony testified that the men struck him, and duct taped him across his eyes, mouth, nose, and hands. At trial, Anthony testified that he had identified a Mark Williams, from a photo array shown to him by police, as the man who struck him in the back of the van.

11

Anthony next stated that while he was being duct taped and restrained, he heard one of the men ask what should be done with the children, and he heard Posey responding "duct tape them, too." According to Anthony, once he and the children were duct taped, they were "taken for a short ride," which appeared to be only a few blocks away, whereupon they were "transferred to another van." Anthony stated that although he could not see the vehicle he was placed in he assumed it was a van because he heard sliding doors. While inside the second vehicle, Anthony heard someone ask where they would take Anthony and the children and he heard "Sedgwick" say, "take them to grandma's house." Anthony was not questioned on how he recognized defendant's voice.

Anthony averred that at the next stop, the children were taken away while he was transferred alone into yet another car and placed on the floor of the backseat. During this car ride, Anthony could glean that there were at least three men in the car because one had his feet on him, and he could hear the conversation between the two men in the front. According to Anthony the car ride lasted approximately 20 minutes. Once the car stopped, Anthony was taken out of the vehicle and the tape was taken off his hands. Anthony was told that he would be brought to a house and that the tape would be taken off his face once he reached the front door. Posey specifically instructed him to ask for Lisa. Once Anthony reached the front door, he felt the tape being removed from his face.

According to Anthony, a young boy, about 12 or 13 years old answered the door and told them that Lisa was not home. Anthony stated that he heard a telephone ringing in the house and a female voice in the background calling the boy to come to the telephone because his mother

12

wanted him. At that point, Posey grabbed the door and dragged Anthony inside the house and sat him at the dinner table. Anthony saw Posey grab the boy and demand that he be taken to where his mother kept the money. According to Anthony, a little girl, about 10 years old, then appeared in the doorway of the living room and another offender, who was armed with a gun, stood next to her.

While Posey was walking the young boy through the apartment, the doorbell rang. Anthony testified that Posey and the other offender ran outside the apartment. When they ran out of the house, Anthony locked the door behind them and called the police. After the police came, they took Anthony to the police station. When Anthony arrived at Area 2 police station, he saw Posey and identified him as being the offender who spoke to him both inside the cars and inside the house.

When questioned about codefendant Steven Williams, Anthony testified that Steven Williams was not an offender or participant in any crime committed against him or in his presence. He denied ever having told an officer that he saw Steven Williams on the passenger side of his van or "in the living room putting duct tape on the little girl." He also stated that the first time he saw Steven Williams in any shape or form was on July 14, 2005, and he stated that he had never been shown a photograph of him by any police officer.[2]

_____

[2]Immediately upon this testimony, the parties stipulated that if Detective Robert Smith were called to testify, he would testify that on February 17, 2004, at 4:15 p.m., he had a conversation with Anthony, who was shown a photo array. The detective would testify that

Anthony next testified about the January 20, 2004, incident. He stated that at approximately 12:27 p.m. he had picked up his daughter, Sade Baker, from school and parked his van in front of his house at 6860 South Calumet Drive. Anthony stated that his wife was in front of the car with his friend Elgin Wallace, and that he and Sade had just got out of the car, when he observed a vehicle with tinted windows and duct tape on the doors pull up behind him. Anthony then saw defendant get out of the car and start shooting at him. Anthony felt a shot in his arm, yelled "run," and started running toward the house himself. Anthony averred that defendant did not stop shooting but hit him in the head and then the back. Anthony stated that once he was wounded, defendant came very close to him and continued to shoot him in the chest, stomach, legs and other arm. Defendant finally tried to shoot Anthony in the head but his gun "would not go off." According to Anthony, defendant then kicked some dirt in his face and left.

Anthony testified that soon thereafter the police and ambulance arrived and he was taken to Christ Hospital. Once there, Anthony spoke to police, who asked him if he knew the person who shot him. Anthony told the police that it was "the same [person] my son [Malik] pointed out, that he said took the tape off his face in the kidnaping." When asked when Malik made this identification, Anthony stated that between the kidnaping and the time he was shot, the police showed him photographs and asked him if he could identify any more people that had been involved in the kidnaping and he could not. However, he stated that his son Malik was standing

Anthony picked codefendant Steven Williams out of the photo array. He would further testify that he never inventoried that photo array, that he no longer has it and that he cannot find it for purposes of the trial.

14

nearby and then said, "Daddy, this the one that took the tape off my face," identifying defendant.

Anthony averred that after speaking with the police at Christ Hospital, he was brought a photo array, and he identified defendant as the man who shot him.

On cross-examination, Anthony stated that the first time he spoke to the police, he described the offenders involved in his kidnaping as being male blacks, between the ages of 20 and 26, between 5 feet 7 inches and 5 feet 11 inches in height, weighing about 170 to 180 pounds.

On cross-examination, Anthony conceded that he knew defendant before the January 20, 2004, shooting but denied knowing him before the kidnaping. When questioned regarding his prior statements to police about knowing defendant, Anthony denied having told Detective Maas on February 7, 2004, that "he supplied product" to defendant via a Michael Raymond of Joliet. Anthony denied ever having sold cocaine, but admitted to being known as "Crack Daddy" since 1976. Anthony further denied ever knowing a male black in his 40s named Michael Raymond, or Redmond, and denied ever having told police that he knew him.[3]

### b. Liz Baker

Liz Baker next testified that on January 2, 2004, at 7:25 p.m., she and Anthony were in their van parked on the east side of Calumet Street with their two children Millard and Malik Baker, and a child that Liz provides daycare for named Eric Williams (or Redman). According

---

[3]As shall be described below, the aforementioned aspects of Anthony's testimony were challenged by other witnesses at trial.

to Liz, at that time Anthony was seated in the driver's seat and she was in the passenger seat with the children in the back. Liz testified that another van pulled up to the passenger side of their van and a man wearing a black hoody walked around the back of their van to Anthony's window, pointed a gun at him and told him to open the door. Liz testified that she saw two more men exit the van and approach her door. One of the men, whom she later identified as Curtis Posey, attempted to open her door, but it was locked. The third offender went to the back and opened the sliding door where the children were.

Liz averred that after being threatened by the gunman, Anthony opened the driver's side door. Liz stated that the gunman, whom she later identified as codefendant Jeffrey Campbell, ordered Anthony to get into the back of the van. According to Liz, as Anthony started climbing over the seats to the back of the van, she heard Campbell tell Posey to put her in the back of the van as well, and so she opened the passenger side door and ran. As Liz ran westward toward a neighbor's house, she heard Campbell yelling behind her "catch that bitch, catch that bitch." Liz testified that she did not see what happened to the van and that she eventually went home.

Liz next averred that later that night she received a call from the 7th District police station informing her that her children were there and that they had been reported as "walking the streets alone." Once at the police station, Liz told the officer that the children had been kidnaped that day.

Liz next testified with respect to the January 20, 2004, incident. According to Liz, at approximately 12:27 p.m. on the day in question she was standing in front of her house on 6860 South Calumet Drive talking with her friend, Elgin Waller, her daughter Sade, and her husband,

16

Anthony, when she observed a burgundy car with tinted windows pulling up to the house. She then saw a man jump out of that car and shoot at her husband. Liz testified that while Anthony was hit 13 times, the shooter shot many "more times than that." Liz made an in-court identification of defendant as the man who shot her husband.

Liz further testified that after defendant started shooting, Anthony attempted to run but fell to the ground. According to Liz, defendant continued to shoot at her husband until he ran out of bullets. After defendant ran away, the ambulance was called and arrived soon thereafter to take Anthony to Christ Hospital.

Liz testified that while she was at the hospital, the police showed her a photo array including defendant's photograph, but she did not identify anyone from it. Liz, however, averred that on April 6, 2004, she went to Area 2 police station where she viewed a lineup, and identified defendant as the shooter.

On cross-examination, Liz acknowledged that with respect to the kidnaping which occurred on January 2, 2004, she never told police that there were more than three offenders. She also acknowledged that she originally described the three offenders as male blacks between the ages of 22 and 26, with one man being "extremely short." Liz also conceded that it was dark outside when the kidnaping occurred.

On cross-examination, Liz testified that she viewed several lineups and photo spreads related to the kidnaping case. She specifically stated that on February 7, 2006, she viewed a lineup at Area 2 police station and picked out codefendant Jeffrey Campbell as one of the

17

offenders. On April 6, 2004, at Area 2 police station, she viewed a lineup and picked out Curtis Posey.

Liz also testified that on March 8, 2004, at about 4:45 p.m., she viewed a lineup and identified another man as the person who forced Anthony onto the floor of the van, striking him in the head several times. However, Liz could not recall whether that person's name was Mark Williams, a man not charged as a codefednant in the case. At this point in the trial proceedings, the court inquired whether Mark Williams was placed in the photo array as a suspect or filler, and all the attorneys agreed that Mark Williams was a suspect, not a filler, that he was arrested regarding the case, but that neither the prosecution nor the defense knew what had happened to him since.

With respect to codefendant Steven Williams, Liz testified that he was not present on January 2, 2004. She denied ever identifying him either in a lineup or in a photo array as an offender in the kidnaping and denied ever having told police that he was the man who stood next to the passenger side window of the van during the incident.

Liz also testified that her husband is known by the name "Crack" because he "cracks jokes all the time."

When questioned about defendant, on cross-examination, Liz stated that she did not see defendant during the kidnaping incident. Liz explained that she heard defendant's name for the first time after the kidnaping when her children looked at photo arrays and told the police that they recognized defendant from "when he took tape off of their faces." Liz also denied ever

18

having met defendant prior the kidnaping.

### c. Malik Baker

Malik Baker, age nine, was next called as a witness. His testimony began with the prosecutor offering to establish his competency as a witness. When asked whether he knew the difference between a truth and a lie, Malik shook his head from side to side, indicating "no," and said he did not. When questioned whether the prosecutor would be lying if she said that she was wearing a white shirt, Malik indicated that she would be because the shirt was black. After that Malik also indicated that he does understand the difference between a truth and a lie.

At this time, defendant objected to the competency of Malik to testify at trial because he had initially stated that he did not understand the difference between a truth and a lie. The court then continued its own *voir dire* of Malik. The court asked Malik if he knew where he was, and he indicated that he did. The following colloquy next took place:

> "THE COURT: Where are you? What kind of building is this?
>
> MALIK: I forgot.
>
> THE COURT: You don't know where you are?
>
> MALIK: I forgot.
>
> THE COURT: Okay. You know when I asked you to raise your hand to promise to tell the truth?

MALIK: Yes.

THE COURT: What did that mean to you?

MALIK: To tell the truth.

THE COURT: Okay. And what does the truth mean?

MALIK: To not lie.

THE COURT: To not lie. If something really happened and you would say what really happened is that the truth or is that a lie?

MALIK: That is the truth.

THE COURT: Okay. And if something didn't happen that you say it happened even though it didn't happen is that a truth or a lie?

MALIK: That is a lie.

THE COURT: How many fingers do I have up now?

MALIK: Two.

THE COURT: The record will show that the Court has two fingers up. If I told you this was three fingers would that be a truth or a lie?

MALIK: A lie.

THE COURT: If I told you that it was two would that be the truth or a lie?

MALIK: A truth.

THE COURT: Okay. Do you know what happens if you tell a lie in court?

MALIK: No.

THE COURT: No. You know you could get in trouble for it if you tell a lie in court?

MALIK: Yes.

THE COURT: You believe me when I say this?

MALIK: Yes."

The circuit court then found that Malik was competent to testify as a witness.

Malik testified that in January of 2004, he was in the van with his mother, father, brother and cousin, when another van pulled up and a man with a gun came to his father's side of the car. According to Malik, his father did not open the door at first, but did when he was ordered to do so a second time. After his father opened the door, Malik heard the man tell him to move to the back of the van and he did so. Malik stated that "a couple of men" then followed his father to the back of the van and tied him with duct tape. Malik also averred that the men put duct tape on him, his brother and his cousin. He stated that they put duct tape on his legs, arms, and eyes.

Malik testified that after his eyes were duct taped he felt the van moving. He stated that at one point the van stopped and he was taken outside together with his brother and cousin. Malik did not know where his father was at that time. Malik stated that together with his cousin and brother he was then taken into another car with three people. When asked if he had tape on his eyes in that car Malik stated that he did. However, when asked if someone took the tape off

21

his eyes, Malik stated that someone did but indicated that he did not see the person who took the tape off. When asked if he could state whether the three people in the car were "boys or girls," or "how old they were," Malik indicated that he could not.

Malik then stated that after he was in this car, he was taken to the police station by "Crystal Long." Malik averred that before "this lady" took him to the police station, two men, who were inside the car were dropped off somewhere. When asked if saw the two people that "got dropped off," Malik indicated that he had.

Malik was next asked by the State to look around the courtroom and see if anyone that was present in January 2004 was currently inside the courtroom. Malik responded with "no." The following colloquy then took place:

"THE STATE: You want to take a look?

DEFENSE COUNSEL: Objection.

THE COURT: You can try it again but watch your gestures, please.

THE STATE: Do you want to stand up and look around the courtroom?

MALIK: No.

THE STATE: Are you scared?

MALIK: No.

THE COURT: You may try some more, just be careful of how you do it but you can explore this a little bit.

THE STATE: Malik, can I see you look up and look at the people in the courtroom that are sitting here?

MALIK: Yes.

THE STATE: Can you look around at all the people in the courtroom?

MALIK: Yes.

THE STATE: Did you look at all the people in the courtroom?

MALIK: Yes.

THE STATE: Do you see anybody here today that you saw back on that date?

MALIK: No.

THE STATE: Are you looking around at all the people that are here?

DEFENSE COUNSEL: Objection, your Honor.

THE COURT: Overruled

MALIK: Yes.

THE STATE: All around?

MALIK: Yes."

At this point, the State proceeded with another line of questioning and asked Malik if he remembered whether the duct tape came off his eyes at any point during the incident in January 2004. Malik stated that the tape came off his eyes inside a basement. Malik was then shown a photograph marked as exhibit 4A and asked to identify it. Malik indicated that this was a

photograph of the basement where the duct tape was taken off his eyes. He stated that he knew that it was the basement in question because of the "chairs, paint stuff, [and] paint bottles down there." Malik was shown another photograph marked as exhibit 4B and asked to identify it, and he again stated that it was a photograph of the same basement and that he knew that because it contained the "motorcycle [and the] chairs." Malik went on to identify exhibits 4C, 4D, and 4E as photographs of blue chairs and bicycles that were in the basement, as well as the wall of the basement.

Malik was next questioned about a photograph marked exhibit 5A, and he identified it as a car.[4] Malik stated that he was inside this car and that "Sedgwick" was in this car with him. When asked how he knew that "Sedgwick" was with him inside the car, Malik stated "because of his voice." The following colloquy next took place:

"THE STATE: You heard his voice?

MALIK: Yeah.

THE STATE: Did you hear his voice again?

MALIK: No, just in the basement.

THE STATE: You heard his, Sedgwick's [defendant's] voice in the basement?

MALIK: Yes.

---

[4]We note that exhibit 5A is not part of the record and that from the transcript of the trial proceedings it is unclear whether it was ever admitted into evidence at trial.

THE STATE: Did he talk to you?

MALIK: No.

THE STATE: Did he talk to other people?

MALIK: No.

THE STATE: Did you see Sedgwick's [defendant's] face ever?

MALIK: Yeah–no.

THE STATE: Do you see Sedgewick [defendant] in this courtroom today?

MALIK: No.

THE STATE: Do you see Sedgwick [defendant] in this courtroom today?

MALIK: No.

THE STATE: Did you look around?

MALIK: Yes.

THE STATE: You looked all around this room?

MALIK: Yes.

DEFENSE COUNSEL: Objection.

THE STATE: And you don't see Sedgwick [defendant] here today?

MALIK: Yes.

THE STATE: You do see him?

MALIK: Yeah.

THE STATE: Can you point to where he is sitting?

MALIK: Right there. (Indication).

THE STATE: Which one?

MALIK: That one.

THE STATE: You recognize somebody?

DEFENSE COUNSEL: Objection, she asked–

MALIK: Yeah."

At this point in the trial proceedings, the circuit court interrupted and asked Malik to stand in front of the person that he is pointing to, whereupon, Malik left the witness stand and stood next to defendant. The court then stated, "Very good," and indicated for the record that Malik "stood in front of [defendant] in open court."

When Malik returned to the witness stand, the State asked him if he had seen defendant on the night in question. Malik stated that he did not see defendant in the basement but did see him inside the car that was photographed in exhibit number 5A.

When asked who else was in that car with Sedgwick, Malik indicated that there was a "a boy," who appeared to be about 15 years old. Malik also identified exhibit 5C as a photograph of Crystal Long.

On cross-examination, Malik testified while he was in that car, defendant was seated in

the front passenger seat and that Crystal Long was with him. Malik initially stated that while he was in the car with defendant, defendant told him that his name was "Sedgwick." Malik, however, then stated that the police told him both Crystal's and Sedgwick's names. He also first averred that he had never seen Sedgwick before that day in January, but then stated that he heard his father mention Sedgwick's name once "before any of this happened."

On cross-examination, Malik also testified that the duct tape was never taken off his eyes while he was in the basement and that he did not see defendant inside the basement. He also testified that somebody had to help him walk out of the basement because his eyes were duct taped and he could not see. When asked how he could then identify the bicycles and chairs in the photographs of the basement, Malik first became unresponsive, and the court had to admonish him to answer the attorney's question. When Malik refused to do so, the court took note of that for purposes of the record. Malik then responded by saying that the police showed him photographs of the items that were inside the basement. He then added that his eyes were taped only "a little bit" while he was in the basement and that therefore he could see. Malik changed his testimony yet again and stated that he did in fact see defendant inside the basement.

When questioned on when the duct tape was removed from his eyes, Malik testified on cross-examination that it was removed inside the car, and not inside the basement. He stated that a man took the tape off his eyes, but that he did not know which man and that he could not identify that man.

On cross-examination, Malik also acknowledged that during this entire incident the "sun had gone down" and there were no streetlights or other lamps nearby.

27

d.  Millard Baker

Millard Baker, 11 years old, was next called as a witness on behalf of the State.  Millard testified that in January 2004, he was inside his father's van with his father, mother, little brother (Malik) and Eric.  Millard averred that his father was sitting in the front driver's seat at this time.  Millard stated that at one point a man with a gun came to the van and told his father to open the door.  According to Millard, his father opened the door and crawled to the back of the van.  The men came into the van and drove off.  Millard stated that he cold not see when he was inside the van.  He then averred that together with his brother and his little cousin (Red Man) he "went to a basement, or something like that."

Millard testified that he had trouble remembering what happened in the basement.  Millard stated that afterwards, the three of them went into a car with a lady, a boy and another person who sat in the front passenger seat.  He stated that the boy and the man in the passenger seat were "dropped off" and that the woman then took him, his brother and cousin to the police station where they were reunited with his mother.

The State then asked Millard if he saw anyone in the courtroom who was present on that day in January 2004, and over defense counsel's objection, Millard was allowed to state that he did.  The following colloquy and in-court identification then took place:

"THE STATE: Who did you see?

MILLARD: A man.

28

THE STATE: What man did you see? Do you think you can point out the man that you saw?

MILLARD: (Indication).

THE COURT: Ask a little, she's [*sic*] pointing towards the jury box I want to know exactly who she [*sic*] is pointing to.

THE STATE: He is pointing.

THE COURT: Who he is pointing to, excuse me.

THE STATE: Do you want to stand in front of the person that you saw?

MILLARD: No.

THE COURT: Well, you can describe it verbally a little better.

THE STATE: Can–

THE COURT: At this point I know where in the jury box. But you can go ahead.

THE STATE: Was it *this* man?

MILLARD: Yes.

THE COURT: The record will reflect that the witness is identifying [defendant] in open court." (Emphasis added.)

Millard next identified a number of exhibits as being photographs of himself, his brother, Eric Redman, his father's van, the basement he was taken to, and the chair that he sat in while in

the basement. Millard also identified exhibit 5A as the car he was in during the kidnaping.[5]

Millard identified exhibit 5C as the photograph of "a girl" who was in the car with him during

the kidnaping.

During cross-examination, however, Milllard testified that while he was in the basement

he could not see because his eyes were covered with duct tape. Millard also averred that he had

not been able to walk to the car because his eyes were covered, and he stated that somebody

carried him into the car in his arms. He also explained that he did not know how his brother or

cousin got into the car because his eyes were taped.

On cross-examination, Millard also testified that before that night, he had never seen any

of the three people in the car (the young boy, Crystal, or defendant). When asked if he had talked

about the kidnaping with his parents prior to trial, Millard was unresponsive. Millard finally

averred that he did not recognize either of the two codefendants, Steven Williams or Jeffrey

Campbell, who were seated in the jury box with defendant.

When questioned whether anyone had shown him photographs of any of the defendants

present in the courtroom, Millard first stated that he had seen the photographs "a few minutes

ago," "before court," but then changed his testimony stating that he had not seen those

photographs earlier in the day. Millard changed his testimony a third time and stated that he

could not remember if he had ever been show photographs of any of the defendants before that.

---

[5]As noted above exhibit 5A is not part of the record on appeal, and we cannot discern

from the record whether it was ever admitted at trial.

## e. Quincy Saddler and Sade Baker

The State next presented two additional witnesses with respect to the January 20, 2004, incident. First, Quincy Saddler testified that on the date in question he lived at 6858 South Calumet Drive, in Chicago and that he was neighbors with the Baker family. Saddler averred that at approximately 12:27 p.m. on that day, he was standing at the corner of 68th Street and Calumet, about to go into his house, when he saw the Baker family parking their car. Saddler testified that as soon as he saw Anthony get out of his car, he observed a man come out of a maroon car and "just start shooting." Saddler stated that he only saw two shots but indicated that he heard at least 20 more. Saddler testified as soon as he heard the shots he immediately fell to the ground and therefore did not see the face of the shooter.

Next, Sade Baker, Anthony and Liz's 18-year-old daughter, testified that at about 12:27 p.m., on January 20, 2004, she was in front of her house at 6786 South Calumet Drive with her mother, father, their friend Elgin, and a child from her mother's day care. Sade testified that at that time she observed defendant jump out of a burgundy car and start shooting at her father. She stated that her father ran and fell and that defendant followed him and continued to shoot at him.

Sade stated that after defendant ran away, an ambulance was called and her father was taken to Christ Hospital. Sade averred that once she was at the hospital, the police showed her a photo array but she did not pick anyone out of that photo array. Sade went to Area 2 police station on April 6, 2004, to view a lineup where she identified defendant as the shooter. Sade also made an in-court identification of defendant.

On cross-examination, Sade acknowledged that defendant's photograph was part of the original photo array shown to her at Christ Hospital only hours after the shooting and that she did not pick defendant out of that photo array.

### f. Detective Weber

Detective Weber next testified on behalf of the State. He averred that on April 6, 2004, as part of his duties at Area 2 police station, he was assigned to investigate both the kidnaping and attempted murder of Anthony Baker and his family. Detective Weber testified that on that date he conducted a lineup that contained defendant and that was viewed by Liz Baker and Malik Baker. According to Detective Weber, he did the lineup individually, first with Liz and then with Malik. Detective Weber testified that Liz picked defendant out of the lineup as the man who shot at her husband on January 20, 2004. He stated that Malik also picked out defendant from the lineup "as the person who shot his father." Detective Weber acknowledged that he was the only person inside the viewing room with each of the victims, but he averred that he did not tell either Malik or Liz whom he or she should pick out of the lineup.

On cross-examination, Detective Weber changed course and indicated that Liz was present when Malik identified defendant as the shooter. In addition, Detective Weber could not recall if he had investigated whether Malik was present during the shooting of his father on January 20, 2004.[6]

---

[6]In that respect, we note that there is no evidence anywhere in the record that would indicate that Malik was present during the shooting on January 20, 2004.

32

### g. Detective Miguel Rios

Detective Miguel Rios next testified on behalf of the State. He stated that on February 7, 2004, at approximately 9 p.m., as part of his duties at Area 2 police headquarters, he conducted a lineup in conjunction with the case of aggravated kidnaping of the Baker family. He stated that Liz Baker picked out codefendant Jeffrey Campbell as an offender. According to Detective Rios, Liz identified Campbell as the man who, at gunpoint, ordered her husband, Anthony, to go to the back of the van.

### h. Officer Steven Lazzara

Officer Steven Lazzara testified that at approximately 12:50 p.m., on January 20, 2004, he was assigned to investigate the shooting of Anthony Baker. He stated that he was only assigned to investigate this shooting and not the kidnaping which had occurred on January 2, 2004. Officer Lazzara testified that as a result of his investigation, he went to the crime scene near 68th Street and Calumet, where he observed a dozen or more 40-caliber shell casings on the street. He stated that personnel from the crime lab photographed the scene in his presence and collected the evidence.

Officer Lazzarra also testified that on January 24, 2004, he went to Christ Hospital, where he spoke to Anthony. He showed Anthony a photo array, and Anthony picked out defendant as the shooter.

On cross-examination, Officer Lazzara acknowledged that on January 20, 2004, a few hours after the shooting, while at Christ Hospital, he showed Liz Baker and Sade Baker photo

arrays containing defendant's photograph. According to Officer Lazzara, neither Liz or Sade was able to make an identification from that photo array.

On cross-examination, Officer Lazarra also stated that when he spoke to Anthony in the hospital on January 24, 2004, and before he showed Anthony the photo array, Anthony told him that he knew defendant and also that defendant was the person who kidnaped him. Officer Lazarra also testified that out of the six photographs that he showed Anthony on that day four were fillers (not suspects in the case) and one (that of defendant) was a photograph of a person Anthony knew from before. When questioned about the sixth photograph, Officer Lazarra was first vague and then testified that he could not recall who the person in that photograph was.

### i. Detective Robert Smith

Detective Robert Smith testified that in January 2004, he was assigned to the robbery burglary team at Area 2 police station, and that up until that point he had been a detective for approximately six months. Detective Smith averred that as part of his duties, together with his partner Sergeant McClellen, he was assigned to investigate the kidnaping and hijacking of the Baker family which had occurred on January 2, 2004. Detective Smith stated that as part of that investigation, at about 10:50 p.m., on January 3, 2004, together with his partner, he conducted a photo array at the Bakers' home on Calumet Drive. Specifically, Detective Smith averred that he showed the photo array to Malik Baker. According to Detective Smith, Malik's brother and parents were in the front room during the photo array.

Over defense counsel's objection, Detective Smith testified that Malik picked out

34

defendant during the photo array as the person who kidnaped him. Detective Smith then made an in-court identification of defendant. Defense counsel objected to this testimony stating that it was improper for the detective to testify about a photo array identification by Malik Baker, when the trial record failed to show that Malik ever testified to making such an identification. The State conceded that "the kid's testimony was rather difficult to understand" but argued that Malik's father, Anthony, had previously testified that he was with Malik when Malik viewed a photo array. The court indicated that it would take the matter under advisement until the parties could look at the transcripts and tell the court what the transcripts reflected.

At a subsequent trial date, defense counsel asked that the testimony of any police officer testifying with respect to the photo array identifications by either Malik or Millard be stricken because the transcript revealed that neither child had testified regarding such identifications. The court denied defense counsel's motion, noting that the objection made by counsel at trial with respect to this issue goes to the weight of the evidence and not its admissibility. The court specifically stated:

> "I'm not barring it. Some witnesses say this is their recollection in lieu of children, say this is their recollection (*sic*). And the police officers saying later that's their recollection.
>
> The trier of fact has to sort through that. It's – I'm not going to strike it because it's at odds with the other.

* * *

I don't believe the remedy is striking it. It is what it is. This is the evidence. I have different witnesses telling me different things about the same investigation and they are at odds with each other.

* * *

Just because witnesses disagree it doesn't mean one or the other gets stricken, it just means that they disagree and it may impact the weight somewhere down the line."

Detective Smith next testified that he subsequently learned that defendant's last address was 6835 South Dorchester. He stated that at approximately 11:35 p.m., on January 3, 2004, he went to that address, where he was met by defendant's grandmother. Detective Smith testified that defendant's grandmother permitted him into the house and into the basement to search for defendant. Detective Smith stated that after viewing the basement, he contacted the Baker family and had them come to the location. Over defense counsel's objection, Detective Smith testified that Malik viewed the basement and identified it as the place where he was held captive. Detective Smith next identified a series of photographs of the basement at 6853 South Dorchester and a photograph of the fence near the trash cans in the back of the building. Detective Smith also identified a photograph of a roll of duct tape in the kitchen of 6853 South Dorchester, two photographs of a piece of curmpled duct tape on a mattress at 6853 S. Dorchester, as well as a photograph of a curled-up piece of duct tape near the back fence outside.

Detective Smith also testified that on April 6, 2004, he conducted a lineup which was viewed by Sade Baker. He stated that Sade identified defendant as the man who shot her father

on January 20, 2004.

On cross-examination, Detective Smith acknowledged that numerous people were arrested in connection with the aggravated kidnaping. He stated that a man named Mark Williams was never arrested. Detective Smith also testified that he "heard that [Mark Williams' photograph] was put in a photo array," but indicated that he had "no personal knowledge" of such an array and that he has "never seen such a photo array."

On cross-examination, Detective Smith also acknowledged that he conducted a photo array including codefendant Steven Williams, and that Anthony Baker identified Steven Williams as one of the men involved in the kidnaping. Detective Smith also testified that Steven Williams was a "shorter individual," approximately 5 feet tall.

On cross-examination, Detective Smith also averred that Malik told him that he did not know who duct taped him, that he was brought to a basement, and that he was taken out of it by a man who took his hand. Detective Smith testified that Malik indicated that he remembered the voice of the person who led him out of the basement as being that of defendant.

On cross-examination, Detective Smith testified that Anthony and Millard both identified codefendant Steven Williams as involved in the kidnaping.

Detective Smith finally acknowledged that although the Baker's van was recovered, it was never dusted for fingerprints. He also stated that there was no physical evidence (*i.e.*, fingerprints) ever recovered linking defendant to the kidnaping. The State then rested.

### B. Directed Verdict as to Codefendant Steven Williams

After the State rested as to codefendant Steven Williams, Steven presented no evidence and instead moved for a directed verdict. The court granted the motion for a directed verdict finding that the State failed to meet its burden to show beyond a reasonable doubt that Steven participated in the kidnaping. In doing so, the court specifically noted that it had the "scantiest of evidence" about Steven, namely, a photo array that could not be located by the police and a prior identification from a key witness, Anthony, which was recanted in open court.

### C. Defendants' Cases in Chief

#### a. Mark Williams

Codefendant Jeffrey Campbell called Mark Williams as his first witness, and defendant adopted his testimony. Mark, age 24 years old, testified that at about 7:25 p.m., on January 2, 2004, he was "either sick or on his way to the hospital." Mark averred that approximately six weeks later, he was stopped by the police in front of his house at 6411 South Evans Street and was taken to the police station located at 71st Street for questioning. Mark was subsequently transferred to the police station at 111th Street where two detectives questioned him about a kidnaping that had occurred on January 2, 2004. Mark testified that while at the police station he was placed in two separate lineups and that following each the detectives told him that he was "pointed out." Mark stated that he then told the police that on January 2, 2004, he was taken to the emergency room at Providence Hospital by his girlfriend Danielle Hoy because of a nose bleed and that he remained there for at least four to five hours. Mark stated that after the police

38

officers went to the hospital, they released him. Mark averred that after his arrest he was in police custody for a total of three days.

On cross-examination, Mark acknowledged that he has known both defendant and codefendant Jeffrey Campbell from the neighborhood for a couple of years.

### b. Sergeant Paluch

Sergeant Paluch next testified that on March 8, 2004, he showed Liz and Anthony Baker a photo array in regard to the January 2, 2004, kidnaping. According to Sergeant Paluch, this photo array included a photograph of Mark Williams. Sergeant Paluch testified that both Anthony and Liz identified Mark Williams as a participant in the kidnaping.

For a second time in the trial proceedings, the circuit court inquired *sua sponte* whether Mark Williams was a suspect or a filler in the case, and Sergeant Paluch responded that he was a suspect.

### c. Sergeant Deanne Owsianiak

Sergeant Deanne Owsianiak next testified that on January 2, 2004, she was at the 7th District police station, when a black female brought the Baker children to the station. The black female had indicated that she found the children on the street near 63rd and Ashland. Sergeant Owsianiak took the woman's information and "asked the children if they were ok." According to Sergeant Owsianiak, the children did not tell her that they had been kidnaped, but only gave her their mother's telephone number.

Sergeant Owsianiak then called Liz Baker. She stated that during the telephone

conversation Liz did not tell her that the children had been kidnaped. Liz soon came to the police station and retrieved her children.

On cross-examination, Sergeant Owsianiak acknowledged that during the telephone conversation, Liz had stated that her children were missing.

At this point in the trial proceedings, the circuit court *sua sponte* asked the witness what, if anything, the children told her when they were brought into the station, and Sergeant Owsianiak responded that they only said that "they were dropped off, they were lost."

### d. Officer Verdin

Officer Verdin next testified that at about 7:30 p.m., on January 2, 2004, he was a uniformed police officer in a beat car when he answered a call at 6860 South Calumet Drive. Officer Verdin testified that at that time he interviewed Anthony and Liz Baker with respect to the aggravated vehicular hijacking. According to Officer Verdin, both Liz and Anthony indicated that there were only three offenders involved in the hijacking.

### e. Stipulations Offered in Defendant's Case

The parties then stipulated that if called to testify by the defense Officer Rios would testify that Liz Baker identified Curtis Posey as the offender who on January 2, 2004, went to the passenger side door of Anthony's van while armed with a handgun.

The parties further stipulated that if called to testify, Officer Arteaga would state that when he spoke to Anthony Baker in April 2004 about the January 20, 2004, shooting, Anthony told him he knew defendant prior to this incident.

The parties further stipulated that if called to testify by the defense, Detective Smith would aver that as part of his investigation of the January 2, 2004, vehicular hijacking and kidnaping, he prepared a search warrant of the building at 6835 South Dorchester. Detective Smith would state that as part of the complaint for the search warrant he included a statement made to him on January 2, 2004, by Anthony Baker, in which Anthony stated that on January 2, 2004, Detective Smith showed him a photo array and Anthony identified defendant from that photo array as "someone that he knew to be a drug dealer from the area of 68th [Street] and Dorchester."

The parties further stipulated that if the keeper of records at U.S. Cellular Telephone were called to testify he or she would state that cellular phone number 773-593-1219 was registered to defendant and was active from December 29, 2003, through January 22, 2004. The keeper of records would also aver that cellular phone number 773-430-6383 was registered to Liz Baker and was active between May 26, 2001, and July 20, 2005. The keeper of records would finally testify that there were a series of telephone calls made between defendant's and Liz's cellular telephones.

### f. Detective Neil Maas

Detective Neil Maas next testified on behalf of defendant. Detective Maas stated that on February 7, 2004, he had a telephone conversation with Anthony Baker, wherein Anthony told him that he "supplied product to the Williams [defendant] via his connection, Michael Raymond of Joliet."

41

### g. Michael Raymond

Michael Raymond testified that he has known Anthony Baker for about 20 years. He averred that Anthony's nickname is "Crack." Raymond also stated that about two years ago he introduced Anthony Baker to defendant and Torino Fontez Williams at the home of Betty Williams on 68th Street and Dorchester, in Chicago. Raymond testified that defendant and Torino were trying to buy marijuana from Anthony. Raymond also stated that he had previously purchased "little bags" of marijuana from Anthony. Raymond also explained that the word "product" is sometimes used to describe a certain quantity of marijuana.

Raymond further averred that the day after the kidnaping of the Baker family, he spoke with Anthony, who told him that he had been kidnaped. Anthony also told Raymond that he believed that defendant and Torino may have been involved but that he never saw their faces.

Raymond testified that he later heard that Anthony had been shot but indicated that he has not spoken to him since because Anthony's telephone has been out of service.

On cross-examination, Raymond conceded that he has known defendant since defendant was three years old because "my kids are cousins with [defendant] through my wife."

### D. The State's Rebuttal

In rebuttal, the State offered three stipulations. The parties first agreed that, if called to testify, an agent from U.S. Cellular would state that he or she examined the records of a cellular telephone registered to defendant and that they showed that no calls were made to a number registered to Liz Baker after December 30, 2003. The parties next stipulated that if called to

testify the keeper of records from Provident Hospital would aver that "a Mark Williams received emergency treatment at Provident ER on January 2, 2004, and that the record shows his arrival time at the ER to be 10:30 p.m." The parties finally agreed that if Detective Sutherland of Area 2 Violent Crimes were called to testify, he would state that on or about March 8, 2004, he conducted a lineup at Area 2 police station with Mark Williams as a participant in that lineup. Detective Sutherland would further aver that Liz Baker viewed that lineup and that she did not identify anyone from it.

### E. Trial Court Findings

After hearing closing argument by both the State and defense counsels for defendant and codefendant Jeffrey Campbell, the trial court found defendant guilty of aggravated kidnaping (720 ILCS 5/10-2(a)(2), (a)(6) (West 2004)) and acquitted him of all remaining charges (including the aggravated vehicular hijacking (720 ILCS 5/18-4(a)(2), (a)(3) (West 2004)) of the Baker family on January 2, 2004, in case No. 04 CR 11378, and the attempted murder (720 ILCS 5/9-1(a)(1) (West 2004)) of Anthony Baker on January 20, 2004, in case No. 04 CR 1027). The court also acquitted codefendant Jeffrey Campbell of all charges brought against him. In doing so, the court specifically found the testimony of Malik and Millard credible and the testimony of Anthony Baker not credible. The trial court subsequently sentenced defendant to 25 years' imprisonment for aggravated kidnaping. Defendant now appeals.

### II. ANALYSIS

On appeal, defendant contends that (1) that the State failed to prove him guilty beyond a

reasonable doubt; (2) the trial court erred in denying his motion to quash the search warrant and to suppress evidence; (3) the trial court erred in denying his motion to dismiss the indictment; (4) the trial court abused its discretion when it found that 9-year-old Malik and 11-year-old Millard were competent to testify at trial; and (5) the trial court erred when it permitted Detective Smith to testify to a hearsay photo identification of defendant by Malik. As shall be discussed below, we reverse the judgment of the trial court by reason of the substantive insufficiency of the testimony of the two minor witnesses. However, in order to reach that analysis, we must first examine the merits of the other contentions raised by defendant in this appeal.

### 1. Motion to Suppress Evidence

We first address defendant's contention that the trial court erred when it denied his motion to quash the warrant and suppress evidence seized during the search of his grandmother's house and basement. Defendant asserts that the initial and warrantless entry into his grandmother's house and basement was illegal because his grandmother never consented to the entry or search and because there were no exigent circumstances that would have permitted the police to enter the house without a warrant. Consequently defendant contends that any evidence obtained from that initial entry, including the victim's show up of the basement, which was done hours after the initial entry and still without a warrant, as well as any photographs of that basement obtained after a search warrant was procured on the following morning, should have been suppressed as fruits of an illegal search. For the reasons that follow, we disagree.

We first note that in denying defendant's motion to quash arrest and suppress evidence, the circuit court found both that defendant's grandmother consented to the police entry into her

44

home and that exigent circumstances justified the police's failure to procure an arrest warrant. When reviewing a court's ruling on a motion to quash the warrant and suppress evidence, we will not reverse a trial court's denial of defendant's motion to quash the warrant and suppress evidence unless the court's factual findings are clearly erroneous. People v. Henderson, 142 Ill. 2d 258, 293, 568 N.E.2d 1234, 1251 (1990). However, "[w]hen neither the facts nor the credibility of the witnesses is questioned *** the issue *** is a legal one" and the standard of review is *de novo*. People v. Foskey, 136 Ill. 2d 66, 76, 554 N.E.2d 192, 197 (1990) (although

Both section 6 of article I of the Illinois Constitution and the fourth amendment to the Constitution of the United States prohibit police officers from making warrantless, nonconsensual entries into a private residence, absent exigent circumstances. Foskey, 136 Ill. 2d at 74, 554 N.E.2d at 196; Payton v. New York, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371(1980); People v. Day, 165 Ill. App. 3d 266, 268, 519 N.E.2d 115, 116 (1988). In other words, as a general rule, the police need either a warrant, the resident's consent, or probable cause coupled with exigent circumstances to lawfully enter a private residence and effectuate an arrest. Foskey, 136 Ill. 2d at 74, 554 N.E.2d at 196.

In the present case, the State concedes that the police officers did not have a search warrant to initially enter defendant's grandmother's home. Therefore, the question becomes whether entry into that home was proper either because the entry and search were consented to or because there were exigent circumstances present.

We first address defendant's contention that the police were not given consent to enter the house or search the basement. In that respect, we first note that a person may waive his

No. 1-06-0141

fourth amendment rights by consenting to a search conducted without a search warrant.  People

v. Harris, 297 Ill. App. 3d 1073, 1083, 697 N.E.2d 850, 858 (1998).  "When a trial court is

deciding whether consent was given ***, the circumstances must have been such that the police

could have reasonably believed that they had been given consent to enter."  Henderson, 142 Ill.

2d at 299, 568 N.E.2d at 1254.  In addition, the State bears the burden of proving by a

preponderance of the evidence that the consent was given voluntarily (Harris, 297 Ill. App. 3d at

1083, 697 N.E.2d at 858) and that it was more than mere "acquiescence to a claim of [un]lawful

authority" (Bumper v. North Carolina, 391 U.S. 543, 549, 20 L. Ed. 2d 797, 802, 88 S. Ct. 1788,

1792 (1968)).  The question of whether a consent to search is voluntary and not the product of

duress or coercion, express or implied, is a question of fact to be determined by the trial court

from the totality of circumstances.  People v. Hernandez, 278 Ill. App. 3d 545, 551, 663 N.E.2d

86, 90 (1996).

In the present case, during the motion to suppress hearing, the circuit court was presented

with clearly conflicting testimony regarding consent.  On one hand, defendant's grandmother,

Betty, and her granddaughter Fallon both testified that on the night in question they heard the

doorbell ringing and that when Fallon went downstairs and opened the door, the police rushed

into the apartment without permission and proceeded to search the apartment for defendant.  On

the other hand, Detective Smith testified that when he first arrived at Betty's home, he knocked

on the door and Fallon answered.  Detective Smith averred that he identified himself as a

detective of the Chicago police department and asked to speak to the owner of the residence.

According to Detective Smith, an older lady then came to the door and stated that she was

46

defendant's grandmother, Betty. Detective Smith stated that he then asked Betty's permission to search the house for defendant and that she consented to that search.

With respect to the entry and search of the basement, all three witnesses agreed that when more officers entered the house from the back door, and Detective Smith asked Betty if he could search the basement of the house, Betty gave the basement key to Fallon and told her to open the basement door for the police.

In denying defendant's motion to quash the warrant and suppress evidence, the circuit court specifically found with respect to the question of consent that the testimony of Detective Smith was more credible than the testimony of either Betty or Fallon. The circuit court noted that none of the witnesses testified that "this was a tumultuous entry" where the police came in with guns, kicking the door down or ransacking the house, but rather that they all agreed that there was "communication" between the police and Betty. The trial court's determination of credibility will not lightly be disturbed on appeal, unless it is clearly unreasonable. Harris, 297 Ill. App. 3d at 1083, 697 N.E.2d at 858, citing Hernandez, 278 Ill. App. 3d at 551, 663 N.E.2d at 90. We find nothing in the record to support the conclusion that the trial court's choice to believe the testimony of Detective Smith over the testimonies of Betty and Fallon Williams was clearly erroneous. Harris, 297 Ill. App. 3d at 1083, 697 N.E.2d at 858 (holding that the court's determination that a suspect's wife gave valid consent to a warrantless search of the house and garage was not clearly erroneous, where officers testified, contrary to the wife, that they explained the situation to her and asked for her consent and that she was very cooperative, signed a consent form, moved the family's dogs to allow officers into the yard and opened the lock on

the gates and the garage door); see also Hernandez, 278 Ill. App. 3d at 552, 663 N.E.2d at 90-91 (holding that the circuit court's determination that defendant voluntarily consented to the search of his vehicle in a residential garage was supported by the testimony of the State's witness that a consent form was voluntarily signed in defendant's backyard, in the presence of his wife and friends, after officers informed defendant of his rights, notwithstanding the testimony by all of the defense witnesses, including defendant's wife and friends, that defendant was coerced by police). Rather, we hold that the totality of circumstances supports the trial court's conclusion that Betty consented to the search. See Henderson, 142 Ill. 2d at 296-99, 568 N.E.2d at 1252-54 (holding that the totality of evidence supported the conclusion that defendant's mother consented to the police entry of her apartment where the police officer identified himself and asked if defendant was home, and mother said defendant was inside the apartment and then stepped back from the open door and pointed toward defendant's bedroom).

"Because a voluntary consent to a warrantless search and seizure waives the constitutional privilege, the evidence derived therefrom is thus admissible at trial." Hernandez, 278 Ill. App. 3d at 552, 663 N.E.2d at 90. As such, we hold that the circuit court did not err in denying defendant's motion to quash arrest and suppress the evidence.

In coming to this conclusion, we have considered the cases of People v. Johnson, 99 Ill. App. 3d 863, 425 N.E.2d 1215 (1981), and People v. White, 117 Ill. 2d 194, 512 N.E.2d 677 (1987), cited to by defendant and find them inapposite.

In Johnson, the circuit court granted defendant's motion to quash the arrest and to suppress evidence and the State appealed. Johnson, 99 Ill. App. 3d at 864, 425 N.E.2d at 1216.

48

No. 1-06-0141

The issues were decided by the circuit court on a stipulation, without testimony. Johnson, 99 Ill. App. 3d at 864, 425 N.E.2d at 1216. The stipulations established that two police officers interviewed the victim of an attempted robbery, who informed them that her assailant was known to her for some 10 years by the name "Syrup." Johnson, 99 Ill. App. 3d at 864, 425 N.E.2d at 1216. Thereafter, in a conversation with another person the officers learned where the suspect lived, and immediately proceeded to that address. Johnson, 99 Ill. App. 3d at 864, 425 N.E.2d at 1216. When the police knocked at the door, an elderly woman, who was later identified as defendant's grandmother, opened the front door, with the screen door remaining shut. Johnson, 99 Ill. App. 3d at 864, 425 N.E.2d at 1216. The officers properly identified themselves. Johnson, 99 Ill. App. 3d at 864, 425 N.E.2d at 1216. The police then noticed defendant on a stairway inside the house and asked him if he was "Syrup." Johnson, 99 Ill. App. 3d at 864, 425 N.E.2d at 1216. He answered that he was. Johnson, 99 Ill. App. 3d at 864, 425 N.E.2d at 1216. The officers then told defendant's grandmother that they " 'wish[ed] to make an arrest upon the person that they saw on the premises.' " Johnson, 99 Ill. App. 3d at 865, 425 N.E.2d at 1216. The grandmother then opened the screen door, which had remained closed throughout the conversation, and the police entered the house and placed defendant under arrest. Johnson, 99 Ill. App. 3d at 865, 425 N.E.2d at 1216.

In affirming the decision of the circuit court that the entry was nonconsentual, the appellate court held that the evidence presented through the stipulation at best constituted "an acquiescence to authority." Johnson, 99 Ill. App. 3d at 866, 425 N.E.2d at 1217. The court specifically held that it was relevant that the officers never actually "asked permission to enter,"

49

the house and that the stipulation was silent with respect to defendant's grandmother's "subjective state of mind *** upon which the matter of voluntariness is necessarily based." Johnson, 99 Ill. App. 3d at 866, 425 N.E.2d at 1217. In addition, the appellate court noted that if it were to hold that the facts presented in the stipulation were sufficient to show consent, then this would mean that "merely opening a door without comment in response to a police officer's statement that he wished to enter would constituted consent as a matter of law." Johnson, 99 Ill. App. 3d at 866, 425 N.E.2d at 1217.

We first note that, unlike in Johnson, the issues here were not decided upon a stipulation, but rather upon the testimony of witnesses, albeit conflicting, and the question of consent rested entirely upon their relative credibility to be determined by the trier of fact. Unlike in Johnson, where the stipulation indicated that none of the officers ever asked permission to enter the house (Johnson, 99 Ill. App. 3d at 866, 425 N.E.2d at 1217), here, at the motion to suppress hearing, Detective Smith specifically testified that he asked Betty if he could search the house for defendant and that Betty stated that he could. In addition, Detective Smith, as well as Betty and Fallon, all testified that when officers asked Betty if they could search for defendant inside the basement, Betty gave Fallon the basement keys and instructed her to open the door for the police. As such, under the present circumstances, it cannot be said that Betty merely "acquiesced to police authority."

Similarly, in White, the circuit court granted defendant's motion to quash the arrest and to suppress evidence and the State appealed. White, 117 Ill. 2d at 221, 512 N.E.2d at 687. The record in that case established that two officers accompanied defendant's mother to defendant's

brother's residence. <u>White</u>, 117 Ill. 2d at 205, 512 N.E.2d at 679. Defendant's brother, Michael Loving, was eating breakfast with his family, when he heard the doorbell ring. <u>White</u>, 117 Ill. 2d at 205, 512 N.E.2d at 679. Loving then descended the stairs to the first floor, and when he heard his mother call out: "It's me, Michael," he opened the door. <u>White</u>, 117 Ill. 2d at 205, 512 N.E.2d at 680. The record further showed that as Loving opened the door, the two detectives stepped around defendant's mother and entered the hallway, without first asking for permission to enter or announcing their purpose. <u>White</u>, 117 Ill. 2d at 205, 512 N.E.2d at 680. When defendant's mother asked Loving if defendant was at home, Loving first denied that defendant was with him, but then admitted that he was. <u>White</u>, 117 Ill. 2d at 205, 512 N.E.2d at 680. The two detectives then went up the stairs to Loving's apartment. <u>White</u>, 117 Ill. 2d at 205, 512 N.E.2d at 680. Loving followed them up and pushed past them while they were on the stairs. <u>White</u>, 117 Ill. 2d at 205, 512 N.E.2d at 680. The officers searched Loving's apartment and found defendant. <u>White</u>, 117 Ill. 2d at 206, 512 N.E.2d at 680.

The supreme court affirmed the decision of the trial court that the totality of circumstances supported the finding that Loving did not voluntarily consent to the police entry. <u>White</u>, 117 Ill. 2d at 221, 512 N.E.2d at 687. In doing so, the supreme court indicated that Loving opened the opaque door leading to the street only for his mother, not knowing that the offices were waiting to push past her and enter the hallway. <u>White</u>, 117 Ill. 2d at 221, 512 N.E.2d at 687. Moreover, when the police officers had entered the hallway, Loving did not give them permission to go upstairs and in fact pushed past them to enter the apartment first. <u>White</u>, 117 Ill. 2d at 221-22, 512 N.E.2d at 687. In addition, the supreme court noted that "[t]he fact

that [Loving] knew that they were police officers after they entered does not compel the conclusion that he condoned their continued presence" inside his house. White, 117 Ill. 2d at 222, 512 N.E.2d at 687.

Unlike in White, in the present case, neither Betty nor Fallon testified that they were tricked into opening the front door for the police officers. See White, 117 Ill. 2d at 221-22, 512 N.E.2d at 687. Instead, both of these witnesses indicated that Betty had told Fallon to see who was at the front door, and that when the police announced their presence to Fallon and she told her grandmother that it was the police, Betty instructed Fallon to open the door and see what they wanted. In addition, unlike in White, where Loving ran in front of the police when they attempted to reach the upstairs apartment (White, 117 Ill. 2d at 221-22, 512 N.E.2d at 687), Betty willingly gave Fallon the keys to the basement and instructed her to open the door for the police.

For all of the aforementioned reasons, we find, unlike our holding below with respect to the credibility of the two minor witnesses, that the trial court's conclusion that Betty consented to the search of both the apartment and the basement was not clearly erroneous. See Henderson, 142 Ill. 2d at 296-99, 568 N.E.2d at 1252-54 (holding that the totality of evidence supported the conclusion that defendant's mother consented to the police entry of her apartment where the police officer identified himself and asked if defendant was home, and mother said defendant was inside the apartment and then stepped back from the open door and pointed toward defendant's bedroom). As such, we need not address the second and alternative ground for the trial court's denial of defendant's motion to suppress evidence, *i.e.*, the presence of exigent circumstances.

## 2. Motion to Dismiss Indictment

Defendant next contends that the circuit court erred when it denied his motion to dismiss the indictment in case No. 04 CR 11378 because no evidence was presented to the grand jury that would support the return of the indictment charging defendant with aggravated kidnaping (720 ILCS 5/10-2(a)(2), (a)(6) (West 2004)) and aggravated vehicular hijacking (720 ILCS 5/18-4(a)(2), (a)(3) (West 2004)). Defendant specifically contends that the only evidence presented to the grand jury was the statement of Detective Smith that defendant "participated" in the kidnaping. For the reasons that follow, we disagree.

Our supreme court has held that upon defendant's motion to dismiss an indictment the circuit court "has inherent supervisory authority to review grand jury transcripts and determine whether any evidence was presented which tends to connect the accused to the offense charged." People v. Rodgers, 92 Ill. 2d 283, 290, 442 N.E.2d 243-44 (1982), citing People v. Linzy, 78 Ill. 2d 106, 109, 398 N.E.2d 1 (1979) and People v. Lawson, 67 Ill. 2d 449, 455, 367 N.E.2d 1244 (1977). The grand jury is expected to indict an accused only if it determines that there is probable cause for believing that the accused has committed an offense. Rodgers, 92 Ill. 2d at 288, 442 N.E.2d at 242. According to our supreme court, an indictment will withstand scrutiny if the transcript of the grand jury proceedings reveals that "some evidence relative to the charge" was presented to the grand jury. Rodgers, 92 Ill. 2d at 290, 442 N.E.2d at 244; see also People v. Whitlow, 89 Ill. 2d 322, 331, 433 N.E.2d 629, 632 (1982) (holding that if there is some evidence presented to the grand jury from which defendant's illegal conduct can be inferred, the reviewing court will not inquire into the "adequacy of that evidence"). "Some evidence" does not mean

that the State must present the grand jury with evidence as to each element of the offense, but rather means that the evidence submitted must be such that it "tends to connect" the defendant to the crime. See Rodgers, 92 Ill. 2d at 290, 442 N.E.2d at 244. "This evidence which connects may be any direct or circumstantial evidence from which an inference of criminal conduct can be derived." People v. Edwards, 243 Ill. App. 3d 280, 285, 611 N.E.2d 1196, 1200 (1993).

In the present case, applying the standard enunciated by our supreme court, we find that there was "some evidence" presented to the grand jury which tended to connect" defendant to the aggravated kidnaping and aggravated vehicular hijacking with which he was charged. The transcript of the grand jury proceedings reveals that Detective Smith testified that defendant "participated in a kidnaping." Detective Smith identified the victims of this kidnaping as Anthony Baker, his wife, Liz, and three children under the age of 13 (Millard Baker, Malik Baker and Eric Williams). Detective Smith further stated that the "offenders" initially used handguns to hijack the vehicle in which the Baker family was seated. Detective Smith acknowledged that Liz Baker fled the scene but stated that the offenders took Anthony and the three children. Detective Smith averred that the children were ultimately released and that Anthony was "able to get out of the clutches of his kidnapers." Most importantly, Detective Smith testified that Malik Baker viewed a photo array and positively picked out defendant as an offender. Under these circumstances, we cannot find that the trial court erred in denying defendant's motion to dismiss the indictment. See Rodgers, 92 Ill. 2d at 290, 442 N.E.2d at 244.

### 3. Competency of Malik and Millard to Testify at Trial

Defendant next contends that the trial court abused its discretion in finding that 9-year-

old Malik and 11-year-old Millard Baker were competent to testify at trial. We disagree.

Pursuant to section 115-14 of the Code of Criminal Procedure of 1963 all witnesses, regardless of age are presumed competent to testify. See 725 ILCS 5/115-14(a) (West 2000); see also People v. Sutherland, 317 Ill. App. 3d 1117, 1124, 734 N.E.2d 1007, 1013 (2000); People v. Westpfahl, 295 Ill. App. 3d 327, 330-31, 692 N.E.2d 831, 834-35 (1998). Potential witnesses can be disqualified if they are (1) incapable of expressing themselves concerning the matter at hand, so as to be understood, or (2) incapable of understanding the duty of a witness to tell the truth. See 725 ILCS 1/115-14(b)(1), (b)(2) (West 2000). The burden of proving that a witness is not competent to testify falls upon the party challenging the witness's ability to testify. See 725 ILCS 1/115-14(c) (West 2000). The question of a witness's competency is to be determined by the trial judge, and a reviewing court may not disturb that determination absent a clear abuse of discretion. Sutherland, 317 Ill. App. 3d at 1125, 734 N.E.2d at 1013, citing People v. Dempsey, 242 Ill. App. 3d 568, 583-84, 610 N.E.2d 208, 217-18 (1993).

In the present case, defendant contends that both Malik and Millard Baker were incompetent to testify at trial. With respect to Malik Baker, defendant contends that the totality of Malik's testimony, including the competency *voir dire*, initiated by the State and continued *sua sponte* by the trial court, as well as his testimony and demeanor during trial, indicated that he lacked sufficient intelligence to testify. Specifically, defendant contends that Malik was often nonresponsive, and that the court had to admonish him to listen and answer the questions, at one point even taking note for purposes of the record that Malik refused to answer a question. More importantly, defendant contends that Malik himself testified that he did not know the difference

between the truth and a lie and that he testified that he "forgot" where he was and why he was in the courtroom.

Contrary to defendant's contentions, we find insufficient support in the record to disturb the trial court's determination that nine-year-old Malik was a competent witness. In this respect, we note that "[i]t is not incumbent upon a child to give perfect answers to questions asked during the competency determination or at trial to be deemed a competent witness, as one imperfect response to a question is insufficient to invalidate a finding of competency in light of the totality of the responses." Sutherland, 317 Ill. App. 3d at 1125, 734 N.E.2d at 1013. When looked at in its entirety, Malik's testimony at the competency hearing revealed, albeit after prodding by the State and the circuit court, that he displayed a threshold grasp of the difference between telling the truth and lying. Although Malik initially responded in the negative to the State's question of whether he knew the difference between the truth and a lie, he exhibited his understanding of this difference when immediately thereafter he testified that the prosecutor would be lying if she said that she was wearing a white shirt when in fact she was wearing a black one. In addition, in response to the circuit court's further questioning, Malik indicated that if "something really happened" and he said that it happened, that would be the truth, and that if "something did not really happen" but he said that it did, this would be a lie. Malik also answered the following circuit court's questions:

> "THE COURT: How many fingers do I have up now?
>
> MALIK: Two.

THE COURT: The record will show that the Court has two fingers up.  If I told you this was three fingers would that be a truth or a lie?

MALIK: A lie.

THE COURT: If I told you that it was two would that be the truth or a lie?

MALIK: A truth.

THE COURT: Okay.  Do you know what happens if you tell a lie in court?

MALIK: No.

THE COURT: No.  You know you could get in trouble for it if you tell a lie in court?

MALIK: Yes.

THE COURT: You believe me when I say this?

MALIK: Yes"

Under these circumstances, as already noted above, we find that the totality of Malik's responses at the competency hearing was sufficient to indicate that he knew the threshhold difference between telling the truth and lying.  See Dempsey, 242 Ill. App. 3d at 584, 610 N.E.2d at 217-18 (nine-year-old sexual abuse victim found competent to testify, even though when questioned whether he knew the difference between a truth and a lie at the beginning of the *voir dire*, he indicated that he did not; court found that boy's statement that if he told a lie he would "go to the devil" demonstrated his understanding that it was sinful and therefore wrong to tell a lie); see

also <u>Sutherland</u>, 317 Ill. App. 3d at 1125, 734 N.E.2d at 1013 (six-year-old shooting victim was found competent to testify in prosecution for attempted murder and battery with a firearm, even though she stated that "telling the truth made people 'happy'" and lying made them "'mad,'" where she demonstrated the knowledge of the difference between telling the truth and lying by stating that she thought it was wrong to lie and that is she lied she would get a "'whopping'").

We next turn to defendant's contention that Millard was incompetent to testify at trial. In that respect, we first note that prior to or during Millard's testimony, defendant nowhere challenged Millard's competency as a witness or attempted to strike his testimony because of such incompetence. As such, we find that defendant has waived this issue for purposes of appeal by failing to properly preserve the error for review. See <u>People v. Enoch</u>, 122 Ill. 2d 176, 186-87, 522 N.E.2d 1124, 1130 (1988) (holding that in order to preserve an issue for appeal, defendant must first make an objection to the alleged error at trial and then raise it in a posttrial motion).

More overridingly, we find that waiver is proper because defendant has failed to comply with the requirements of Supreme Court Rule 341(e)(7) by failing to elaborate on his argument that Millard was incompetent to testify. See 87 Ill. 2d R. 341(e)(7) (providing that arguments made in support of issues raised on appeal "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and noting that "[p]oints not argued are waived" for purposes of appeal); see also <u>People v. Ramirez</u>, 98 Ill. 2d 439, 472, 457 N.E.2d 31, 47 (1983). In that respect, we note that defendant merely interjects his argument that Millard was incompetent in the middle of his contentions with respect to

Malik's incompetency, by simply contending that "they" (being Malik and *Millard*) were incompetent because "they" were nonresponseive to questions and appeared to lack the appreciation of the role of the parties in the courtroom. Defendant offers no further explanation or argument with respect to Millard's lack of competency.

As such, because of the rule that all witnesses, regardless of age, are presumed competent to testify at trial (see 725 ILCS 5/115-14(a) (West 2000); see also Sutherland, 317 Ill. App. 3d at 1124, 734 N.E.2d at 1013), we are compelled to find that Millard, just as Malik, was a competent witness. Nevertheless, as shall be fully discussed below, our finding of threshold competency with respect to these two minor witnesses by no means predetermines whether the weight of the substantive testimony of these two witnesses was sufficient to support the trial court's finding of guilt.

4. Admissibility of Detective Smith's Prior Identification Hearsay Testimony

Defendant next contends that the trial court erred in admitting Detective Smith's hearsay testimony regarding Malik Baker's photo array identification of defendant, where Malik testified before Detective Smith but was never questioned with respect to this photo array. Defendant specifically contends that Malik, as the declarant of the out-of-court identification, was never made available for cross-examination concerning the statement, because he was never asked about the statement during direct examination.

While, for the reasons discussed below, we find this evidence to be of insufficient weight to have substantive efficacy to support the finding of the trial court, we nevertheless find that it

59

satisfies the requirement of section 115-12 of the Code of Criminal Procedure (725 ILCS 5/115-12 (West 2000)) to be admitted into evidence as an exception to the hearsay rule.

We first note that section 115-12 of the Code of Criminal Procedure permits the introduction of hearsay testimony with respect to prior identifications in certain circumstances. See 725 ILCS 5/115-12 (West 2000). Section 115-12 of the Code of Criminal Procedure, titled "Substantive Admissibility of Prior Identification" states in pertinent part:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2000).

We next note that our supreme court has recently addressed and resolved the exact issue raised here by defendant, namely, whether under the aforementioned section of the Code of Criminal Procedure, to be "subject to cross-examination concerning the statement," the declarant must testify to the out-of-court identification before a third party may offer testimony on that matter. See People v. Lewis, 223 Ill. 2d 393, 402-06, 860 N.E.2d 299, 305-07 (2006).

In Lewis, at defendant's trial for the unlawful delivery of a controlled substance, Clem, the State's key witness testified that she purchased drugs from defendant and made an in-court identification of defendant. Lewis, 223 Ill. 2d at 397, 860 N.E.2d at 302. Clem, however, did not testify to her prior photo identification of defendant. Lewis, 223 Ill. 2d at 397, 860 N.E.2d at 302. Subsequent to Clem's testimony, the State called a police detective who testified that prior

to trial he showed Clem a photograph of defendant and that she immediately identified the photograph as that of the man who had sold her cocaine the previous day. Lewis, 223 Ill. 2d at 398, 860 N.E.2d at 303.

On appeal, defendant contended that the trial court erred in admitting the police detective's testimony that Clem had made an out-of-court identification of defendant. Lewis, 223 Ill. 2d at 400, 860 N.E.2d at 303. Specifically, defendant contended that Clem was not subject to cross-examination on her prior photo identification because the State had failed to raise this issue on direct examination, thereby barring defendant from raising this issue on cross-examination. Lewis, 223 Ill. 2d at 403-04, 860 N.E.2d at 305-06.

The supreme court disagreed, first holding that the plain language of section 115-12 merely requires that declarant testify and be subject to cross-examination on the identification statement, and that there is no requirement that the declarant "testify on the out-of-court identification before a third party may testify about that identification." Lewis, 223 Ill. 2d at 403, 860 N.E.2d at 305. In addition, the supreme court found that Clem was subject to cross-examination as required under section 115-12 of the Code of Criminal Procedure, because she was "placed on the witness stand, under oath, and respond[ed] willingly to questions." Lewis, 223 Ill. 2d at 404, 860 N.E.2d at 306. More overridingly, the supreme court rejected defendant's argument that he was prevented from cross-examining Clem about her out-of-court identification because this issue was not raised by the State on direct examination, holding that defendant was free to recall the witness for cross-examination after the detective testified about her photo identification. Lewis, 223 Ill. 2d at 404, 860 N.E.2d at 306.

Applying the principles articulated in <u>Lewis</u> to the case at bar, we find that the trial court committed no error in permitting Detective Smith to testify regarding Malik Baker's photo array identification of defendant. Just as in <u>Lewis</u>, in the present case, Malik Baker was called as a witness on behalf of the State and under oath testified to the circumstances of the kidnaping, making an in-court identification of defendant. Malik, however, was not questioned regarding his prior photo array identification of defendant. Instead, Detective Smith testified later in the trial proceedings that on January 3, 2005, he went to the Baker residence, where he showed Malik a photo array including a photograph of defendant. According to Detective Smith, Malik picked defendant out of that photo array. Because Malik was present at trial, testified under oath, and was available to be recalled as a witness after the testimony of Detective Smith for purposes of cross-examination, we find that the trial court did not err in admitting the photo array identification testimony pursuant to section 115-12 of the Code of Criminal Procedure (725 ILCS 5/115-12 (West 2000)). See <u>Lewis</u>, 223 Ill. 2d at 404, 860 N.E.2d at 306.

### 5. Sufficiency of Evidence

We lastly address defendant's contention that the State failed to prove him guilty of aggravated kidnaping by accountability beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence, the relevant question on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>People v. Hall</u>, 194 Ill. 2d 305, 330, 743 N.E.2d 521, 536 (2000); <u>People v. Young</u>, 128 Ill. 2d 1, 51, 538 N.E.2d 461, 473 (1989). As such, "it is our duty in the case at bar to carefully examine the evidence

while giving due consideration to the fact that the court *** saw and heard the witnesses." People v. Smith, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 369 (1999). "If, however, after such consideration we are of the opinion that the evidence is insufficient to establish defendant's guilt beyond a reasonable doubt, we must reverse the conviction." Smith, 185 Ill. 2d at 541, 708 N.E.2d at 369, citing People v. Bartall, 98 Ill. 2d 294, 306, 456 N.E.2d 59 (1983). While the weight to be given to the testimony, the credibility of the witnesses, the resolution of conflicting testimony, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact, and the trier of fact is entitled to great weight on these matters, its determination is nevertheless not conclusive. Smith, 185 Ill. 2d at 541, 708 N.E.2d at 370. Rather, we will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify reasonable doubt of defendant's guilt. Smith, 185 Ill. 2d at 542, 708 N.E.2d at 370, citing People v. Pellegrino, 30 Ill. 2d 331, 196 N.E.2d 670 (1964).

In the present case, defendant was found guilty of aggravated kidnaping under accountability principles. In Illinois, a person is legally accountable for the criminal conduct of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2002). To prove that defendant was accountable under section 5-2(c) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/5-2(c) (West 2000)), the State was required to establish beyond a reasonable doubt that (1) defendant solicited, ordered, abetted, agreed or attempted to aid another in the planning or commission of the crime; (2) defendant's participation took place before or

during the commission of the crime; and (3) the defendant had the concurrent intent to promote or facilitate the commission of the crime. See People v. Perez, 189 Ill. 2d 254, 267-68, 725 N.E.2d 1258, 1265 (2000).

Here, the only evidence linking defendant to culpable involvement in the aggravated kidnaping is the testimony of the two minor children, Malik, age 9, and Millard, age 11. As the record reveals, none of the adults at trial could identify this defendant as a participant in the aggravated kidnaping.[7] In addition, the State conceded during oral argument that there was no physical evidence introduced at trial linking defendant to the crime. As a result, defendant's culpability rested solely on the hesitant testimony of the two minors and must therefore be carefully scrutinized. After a review of the evidence, viewed in the light most favorable for the prosecution, for the reasons that follow, we find that the testimony of these two witnesses, which came after substantial prodding through vigorous leading questions, was riddled with internal inconsistencies and self-contradictions, was hesitant, vague and, insofar as it involved the time of their first meeting defendant, impeached by the testimony of other witnesses and the telephone

_____

[7]In that respect, we note that although the record reveals that Anthony testified that while in the second van, he heard someone ask where the offenders should take him and the children, and he heard "Sedgwick" say "take them to grandma's house," Anthony was never questioned on how he recognized this voice or who "Sedgwick" was. Rather, throughout the trial, Anthony continued to maintain that he did not know, see or meet the defendant prior to the shooting, which took place 18 days after the kidnaping, thus negating that he had any basis for any voice recognition of defendant.

records at trial. As such, this testimony was substantially unreliable and too tenuous to sustain the trial court's finding of guilt.

We first consider Malik's initial opportunity to observe defendant's involvement in the crime and find his testimony in this regard to be consistently contradictory. The record reveals that Malik first testified that immediately after the initial carjacking the kidnapers, none of whom he identified as defendant, taped his eyes with duct tape. Malik next testified that he did not recall getting out of their van, but did remember getting into another car. Malik testified that he had tape on his eyes and remembered a man taking the tape off, but stated that he could not identify the man who took the tape off his eyes.

In addition, Malik later testified that he remembered that there were three people in the car with him, but could neither recall if they were "boys or girls, or their ages." Malik recalled, however, that the woman's name was "Crystal Long," and stated that "this lady" took him to the police station. On cross-examination, he admitted that the police told him Crystal's name. Malik then changed his testimony and stated that two men were inside the car and that they were "dropped off" before he was taken to the police station. When asked by the State if he saw the two men that got "dropped off," Malik indicated that he had not.

Furthermore, Malik's testimony as to where he actually saw defendant is glaringly contradictory. While Malik initially testified that he saw defendant inside a basement, he admitted at trial that his eyes were taped, that "he could not see" inside the basement and that therefore he did not see defendant there. Malik changed his testimony again during trial and stated that he could see inside the basement and that he saw defendant there. Malik finally

65

changed his story for the third time and testified that he in fact did not see defendant inside the basement but that he did see him inside the car.

Malik's voice identification of defendant suffers from similar contradictions. The record reveals that this voice identification occurred when the State showed Malik a photograph of a car, and Malik stated that he was inside this car with "Sedgwick," and that he knew it was "Sedgwick" "because of his voice." We first note that the photograph of this car was never introduced into evidence at trial, and is not part of the record on appeal. In addition, we note that although Malik explained that he recognized defendant's voice because he had just heard it inside the basement, when asked by the State if defendant had spoken to him or to anyone else inside the basement, Malik stated, "no."

Malik's voice identification of defendant was further contradicted by his testimony that he had never seen or heard defendant before the kidnaping. Malik initially testified that he had not met defendant before the incident and that he knew defendant's name only because defendant had introduced himself inside the car as "Sedgwick." However, Malik then changed his testimony and stated that he knew defendant's name because the police told him defendant's name was "Sedgwick." Malik then changed course a third time and explained that he knew the name because he had heard his father mention "Sedgwick's name" once at home "before any of this happened."

In this respect, we further note that the court chose not to believe the testimony of Anthony, his wife, Liz, and their eldest daughter, Sade Baker, with respect to their identification of defendant as the shooter in the attempted murder case, because they were impeached by

66

telephone records and the testimony of Michael Raymond, which indicated there was an on-going relationship between Anthony and defendant. Arguably, Malik's statement that he had not met or seen defendant prior to the incident would have been impeachable by this same evidence, as there would be no reason by which to treat Malik's testimony differently, by the mere fact that he was a minor at the time of the incident.

Moreover, we find little value in Malik's identification of defendant's grandmother's basement, in which he was allegedly kept during the kidnaping. When initially questioned by the State as to whether he remembered if the duct tape came off his eyes at any point during the kidnaping, Malik first stated that the tape came off his eyes inside a basement, and then went on to identify photographs of that basement and the chairs and bicycles inside it. Nevertheless, on cross-examination, Malik testified that the duct tape was never taken off his eyes while inside the basement. In addition, Malik stated that somebody had to help him walk out of the basement because his eyes were duct taped and he could not see. When asked how he could then identify the bicycles and chairs in the photographs of the basement, Malik first became unresponsive, then stated that the police had showed him photographs of the items that were inside the basement. Malik then changed course and averred that his eyes were "taped only a little bit" and that therefore he could see inside the basement.

Under all of the above circumstances, we find that Malik's in-court identification of defendant in response to the State's relentlessly leading questions was far too tenuous and internally inconsistent to be supportive of the trial court's finding. The record reveals that when Malik was asked if he would look around the courtroom to see if he could recognize anyone that

was present during the kidnaping, Malik responded with "no." The following colloquy then took place:

"THE STATE: You want to take a look?

DEFENSE COUNSEL: Objection.

THE COURT: *You can try it again but watch your gestures, please.*

THE STATE: Do you want to stand up and look around the courtroom?

MALIK: No.

THE STATE: Are you scared?

MALIK: No.

THE COURT: *You may try some more, just be careful of how you do it but you can explore this a little bit.*

THE STATE: Malik, can I see you look up and look at the people in the courtroom that are sitting here?

MALIK: Yes.

THE STATE: Can you look around at all the people in the courtroom?

MALIK: Yes.

THE STATE: Did you look at all the people in the courtroom?

MALIK: Yes.

THE STATE: Do you see anybody here today that you saw back on that date?

MALIK: No.

THE STATE: Are you looking around at all the people that are here?

DEFENSE COUNSEL: Objection, your Honor.

THE COURT: Overruled

MALIK: Yes.

THE STATE: All around?

MALIK: Yes." (Emphasis added.)

After Malik already failed to identify defendant in court on these two occasions, later in his testimony, Malik changed course and ultimately made an in-court identification in the following inconsistent manner. When the State asked Malik whether he ever saw defendant's face, Malik first stated "yeah-no." The following colloquy between the State and Malik then occurred:

"THE STATE: Do you see Sedgwick [defendant] in this courtroom today?

MALIK: No.

THE STATE: Do you see Sedgwick [defendant] in this courtroom today?

MALIK: No.

THE STATE: Did you look around?

MALIK: Yes.

THE STATE: You looked all around this room?

MALIK: Yes.

DEFENSE COUNSEL: Objection.

THE STATE: And you don't see Sedgwick [defendant] here today?

MALIK: Yes.

THE STATE: You do see him?

MALIK: Yeah.

THE STATE: Can you point to where he is sitting?

MALIK: Right there. (Indication).

THE STATE: Which one?

MALIK: That one.

THE STATE: You recognize somebody?

DEFENSE COUNSEL: Objection, she asked–

MALIK: Yeah."

At this point in the trial proceedings, the circuit court interrupted and asked Malik to stand in front of the person that he was pointing to, whereupon, Malik left the witness stand and stood next to defendant. Under these circumstances, we find that Malik's hesitant and vacillating identification, engendered by the State's relentlessly leading questions, clearly lacks reliability to sustain the judgment.

70

As indicated above, the foregoing reasons which rendered Malik's in-court identification unreliable and insufficient to support the trial court's finding permeate and also reflect on the unreliability of his alleged prior photo identification to which Detective Smith testified at trial. Because Malik was never questioned and never testified regarding the circumstances of this photo identification at trial, Detective Smith's testimony with respect to this photo identification, albeit admissible, is insufficient standing alone to support the trial court's finding.

We similarly turn to Millard's testimony. In that respect, we first note the contradictions in Millard's identification of defendant's grandmother's basement, where he was allegedly kept during the kidnaping. Millard initially testified that after the initial carjacking, he was taken together with Malik and Eric Redman to "a basement or something like that." Millard then indicated that he actually had trouble remembering what happened inside the basement. Although Millard later identified photographs of the basement, he nevertheless testified that while he was inside the basement, he could not see because his eyes were covered with duct tape. Millard also averred that he had not been able to walk from the basement to the car because his eyes were covered and that instead somebody had to carry him into the car. He also explained that he did not know how his brother or cousin got into the car because "his eyes were taped."

We similarly find Millard's in-court identification of defendant troubling in light of Millard's answers to the following questions posed at trial. When asked if anyone had shown him photographs of any of the three defendants present in the courtroom at trial, Millard first stated that he had seen the photographs "a few minutes ago" and "before court." Millard, however, then changed course and averred that he had not seen those photographs earlier in the

day. Millard changed his testimony for a third time and stated that he could not remember if he had ever been shown photographs of any of the defendants before trial. In that respect, we find relevant that although Millard was older than Malik at the time of the kidnaping, according to Detective Smith's own testimony, unlike Malik, Millard was never asked by the police to make a photo identification, or for that matter, any type of identification of defendant, immediately after the kidnaping or at any time prior trial. In addition, when asked at trial whether he ever talked to his parents about the kidnaping, Millard refused to answer the question and continued to be unresponsive.

We note that Millard's in-court identification of defendant came only after the prosecutor pointed her finger at defendant and asked him if "*this* [was] the man." (Emphasis added.) The record reveals that when first asked if he saw anyone in the courtroom who was present during the kidnaping, Millard stated that he did, and the following in-court colloquy then occurred:

"THE STATE: Who did you see?

MILLARD: A man.

THE STATE: What man did you see? Do you think you can point out the man that you saw?

MILLARD: (Indication).

THE COURT: Ask a little, she's pointing towards the jury box I want to know exactly who she is pointing to.

THE STATE: He is pointing.

THE COURT: Who he is pointing to, excuse me.

THE STATE: Do you want to stand in front of the person that you saw?

MILLARD: No.

THE COURT: Well, you can describe it verbally a little better.

THE STATE: Can–

THE COURT: At this point I know where in the jury box. But you can go ahead.

THE STATE: Was it *this* man?

MILLARD: Yes.

THE COURT: The record will reflect that the witness is identifying [defendant] in open court." (Emphasis added.)

The State nevertheless argues that the inconsistencies in the testimonies of Malik and Millard were minor and that the credibility of witnesses rests within the purview of the trier of fact, who in this case found the testimonies credible. We acknowledge that the "weight of the evidence, credibility of witnesses or resolution of conflicting testimony" are the province of the trier of fact. People v. Jones, 295 Ill. App. 3d 444, 452, 692 N.E.2d 762, 768 (1998). However, in the preset case, the inconsistencies and contradictions and other vulnerabilities in Malik's and Millard's testimonies were major, rather than minor, and, in fact, materially essential to the identification of defendant as a participant in the kidnaping.

Our supreme court has previously held that a conviction cannot be sustained on doubtful,

vague and unreliable identification testimony. People v. Ash, 102 Ill. 2d 485, 494, 468 N.E.2d 1153, 1158 (1984); see also, *e.g*., People v. Dowaliby, 221 Ill. App. 3d 788, 800, 582 N.E.2d 1243, 1250-51 (1991); People v. Williams, 244 Ill. App. 3d 669, 673, 614 N.E.2d 367, 370 (1993). Moreover, as already noted above, our supreme court has held that a trial court's finding of witness credibility may be set aside in the face of serious inconsistencies and/or repeated impeachment of witness testimony. See *e.g*., Smith, 185 Ill. 2d at 541-45, 708 N.E.2d at 369-71 (holding that witness's testimony that defendant shot victim was not credible and therefore insufficient to sustain defendant's conviction of murder, where witness's testimony that victim came out of bar alone, that the shooter came out of bar a few seconds later, and that victim was standing alone when he was shot was contradicted by testimony of bartender and victim's companions, witness's credibility was repeatedly impeached with signed statements she gave to defense investigator five months before trial, and witness had a motive to falsely implicate the defendant); People v. Schott, 145 Ill. 2d 188, 205-09, 582 N.E.2d 690, 690-700 (1991) (holding that there was insufficient evidence to support a conviction of defendant for aggravated indecent liberties with his stepdaughter, where the victim's testimony was fraught with inconsistences and contradictions); People v. Williams, 65 Ill. 2d 258, 266, 357 N.E.2d 525, 528-30 (1976) (reversing conviction for murder and attempted armed robbery for want of sufficiency of evidence where the testimony of the state's only witness was "so thoroughly impeached that, absent very substantial corroboration, it could not support a finding of guilt"; the court noted that although the witness who was only 15 years of age at the time of the incident consistently testified that defendant was the individual who fired the gun, he "made inconsistent statements

*** with respect to virtually every other important segment of his testimony").

Given the serious internal inconsistencies and contradictions in Malik's and Millard's testimonies, as well as their repeated and continued hesitancy and reluctance to respond to questions while on the witness stand, in the present case, we find that no reasonable trier of fact could have found their identifications to be credible or reliable. Accordingly, absent any corroborative evidence of defendant's presence at the scene of the crime, we find that the testimonies of Malik and Millard were not sufficient to prove defendant guilty beyond a reasonable doubt. See Smith, 185 Ill. 2d at 541-45, 708 N.E.2d at 369-71.

Because we reverse on these grounds, we need not consider defendant's contention that he was denied a fair trial when the trial judge assumed the role of prosecutor.

Reversed.

McBRIDE, P.J., and O'MALLEY, J., concur.

No. 1-06-0141

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**
**(Front Sheet to be Attached to Each Case)**

Please use the following form

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

SEDGWICK WILLIAMS,

Defendant-Appellant.

No. 1-06-0141

Docket No.

COURT

Appellate Court of Illinois
First District, SIXTH Division

Opinion Filed

June 20, 2008
(Give month, day and year)

JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT:

JUSTICES

PRESIDING JUSTICE McBRIDE and JUSTICE O'MALLEY concur.

Lower Court and Trial Judge(s) in form indicated in margin:

APPEAL from the Circuit Court of Cook County; the Hon___ Judge Presiding.

Appeal from the Circuit Court of Cook County;

The Hon. James B. Linn Judge presiding..

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel. Indicate the word FOR NONE if not represented.

APPELLANTS
John Doe, of Chicago

For APPELLEES, :

Smith and Smith of Chicago,

FOR APPELLANT: Robert A. Fisher, Robert A. Fisher, Ltd., 20 South Clark St., Suite 700, Chicago, IL 60603

FOR APPELLEE: Richard A. Devine, State's Attorney, and James E. Fitzgerald, Samuel Shim and Anjana Hansen, Assistant State's Attorneys, of Counsel, Cook County, Richard J. Daley Center, Rm. 309, Chicago, IL 60602

Add attorneys for third-party appellants and/or appellees.