2021 IL App (1st) 912516-U

No. 1-91-2516

Order filed December 17, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 89 CR 14118 |
| | ) | |
| JUAN AGUILAR, | ) | The Honorable |
| | ) | Earl E. Strayhorn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1     *Held*: The evidence was insufficient to sustain defendant's conviction where the victim's identification of defendant was not positive.

¶ 2     Following a bench trial in 1991, defendant Juan Aguilar was convicted of aggravated criminal sexual assault. Thirty years later, we consider his direct appeal. On appeal, defendant asserts that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) a fatal variance existed between the indictment and the proof at trial; and (3) the trial court erroneously

denied defense counsel's motion to suppress evidence of an identification confrontation where the prosecution failed to disclose such evidence until the middle of trial. Because we agree that the evidence was insufficient to sustain defendant's conviction, we reverse the judgment.

¶ 3                                           I. Background

¶ 4                                        A. Procedural History

¶ 5      In 1991, defendant was sentenced *in absentia* to 30 years in prison for aggravated criminal sexual assault. His direct appeal was subsequently dismissed, likely because he left the country. In 2004, however, defendant was arrested and began serving his sentence.

¶ 6      Defendant next sought relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)). The trial court summarily dismissed that petition and we reversed and remanded for second-stage proceedings based on his claim that he was denied the right to be present at trial. *People v. Aguilar*, 2020 IL App (1st) 161643. Specifically, we found that the pronouncement of defendant's guilt was arguably a critical stage of trial and that the lack of an interpreter meant that defendant was not present, despite being inside the courtroom. We noted that by being absent for the pronouncement of guilt, defendant also would have been absent when the trial court set the next court date and statutorily admonished him about the prospect of being sentenced *in absentia*.

¶ 7      On November 5, 2020, the supreme court entered a supervisory order directing this court to reinstate defendant's direct appeal, which is now before us. *Aguilar v. Coghlan*, No. 126549 (Ill. Nov. 5, 2020) (supervisory order).

¶ 8                                        B. Trial Proceedings

¶ 9      As stated in our prior opinion, in 1989, defendant was charged with one count of aggravated criminal sexual assault, three counts of criminal sexual assault and one count of

aggravated criminal sexual abuse. The charges were based on contact between defendant's penis and the vagina of R.M., a minor. At trial, defendant required a Spanish interpreter. Additionally, R.M. required assistance with her testimony because she was "brain damaged" and had developed her own language with her mother and sister. Defense counsel initially objected to having R.M.'s mother act as her interpreter but the court overruled that objection. After R.M. was questioned to ascertain her competency as a witness, defense counsel was satisfied that she was competent. We note that even with the assistance of R.M.'s mother, the parties struggled to make a clear record.

¶ 10    R.M. testified that on June 13, 1989, she lived with her mother Cindy and her sister Michelle, although R.M. did not know if Michelle was older or younger than her. That day, R.M. was outside with her friend Melissa. When asked what they were doing outside, R.M. testified, "[h]e humped me." R.M. subsequently explained that Melissa took her to a house in the neighborhood and a boy took R.M. inside while Melissa stayed outside.[1] Downstairs, a boy held R.M.'s arms tight while she lay on the floor. R.M.'s subsequent testimony was inconsistent regarding the number of boys present and whether she was in a basement.

> "Q. What happened to you, [R.M.]?
>
> A. That boy here (indicating).
>
> Q. What was he doing to you?
>
> A. He hold me.
>
> Q. He was holding you?
>
> A. Yes."

---

[1] We note it appears that the house had been divided into apartments.

She testified that while defendant held her arms, "[t]hey humped." She later testified, however, that only one boy was with her.

¶ 13     When R.M. went home, she encountered Michelle and her friend Charles. She then brought them to the house where the incident occurred and saw the male who humped her as well as the male who held her arms down. Although R.M. had been testifying about two boys, she testified that she told Michelle that "that was *the* guy." (Emphasis added.) Subsequently, R.M. showed the police the house in question.

> "Q. Did you show the police the guy who you said was there?
>
> A. Yes.
>
> Q. Now, the guy that you showed the police, is he in this courtroom now?
>
> A. No.
>
> Q. Did you tell the police officers who it was that held your arms down?
>
> CINDY [Victim's Mother]: She doesn't know what courtroom is.
>
> A.  No. Yes."

Neither the attorneys nor the court sought clarification.

¶ 14     On cross-examination, the following ensued:

> "Q. Who took you into that basement?
>
> A.  That guy.
>
> Q. But not that guy, right?
>
> A. No."

R.M. further testified that when she returned to the house where the incident occurred, she told Michelle "*something* about that man (indicating)." (Emphasis added.) Additionally, the second time she went to the house was the first time she had seen "that man." R.M. later reiterated that

she was with Michelle when she first saw defendant. Furthermore, Michelle had pointed him out to R.M. and told her that "this is the guy."

¶ 15    On redirect examination, R.M. testified that she saw "him" when she brought Michelle to the house and again when the police went to the house. When later asked if she had seen the person who held her hands down, she answered, "Him (indicating)."

¶ 16    When the trial court asked R.M. who had hurt her, she answered, "The man that not here."

¶ 17    Michelle testified that at the time of the incident, she was 15 years old and R.M. was 13 or 14 years old. R.M. had returned home looking scared and holding her underwear. She said she was "humped" and indicated to her groin. Subsequently, R.M. showed Michelle and her friend Charles the house where R.M. had been hurt. They ultimately gained entry when a male individual walked down the stairs. As Charles spoke to him, Michelle and R.M. went to an upstairs apartment, where R.M. looked around. Michelle spoke to two males playing dominos and asked, "Where is the guy that humped my sister?" In addition, R.M. asked, "Where is he?" One of the individuals answered in English that the person Michelle was looking for was not present. Michelle testified that she and R.M. had not been looking for the person who held R.M.'s arms down because R.M. had not yet mentioned that this had occurred.

¶ 18    The sisters and Charles returned home to call the police. When at least one police officer arrived, R.M. showed him the house and told him what happened. Eight to ten people were lined up on the porch and R.M. pointed defendant out as someone who was present at the incident.

¶ 19    Nurse Loretta Bogolin testified that when she examined R.M. at the hospital, R.M. said she was sexually assaulted and pointed to her vaginal area. Her hymen was torn and bruised, and semen was present.

¶ 20    Detective Kenneth De Falco testified that at about 10:15 p.m. on the night in question, he interviewed Michelle and Charles. R.M. was also present. Subsequently, Detective De Falco went to a two-story residence where seven or eight men were standing outside on their own volition. According to Detective De Falco, R.M. identified defendant as having been present during the offense. Although Detective De Falco testified that R.M. was positive in her identification, R.M. also identified defendant's cousin as having been present and he was not charged. Additionally, R.M. told Detective De Falco that defendant held her hands down while another Hispanic male humped her.

¶ 21    Following Detective De Falco's testimony, defense counsel moved to suppress evidence of the identification at the scene because the State had never disclosed it and it was otherwise improper. The court denied that motion, stating, "This is an investigation in progress." The court subsequently denied defendant's motion for a directed verdict.

¶ 22    Defendant testified on his own behalf that on June 13, 1989, he had only just arrived in the United States from Mexico two months before. On that day, he arrived home from work at about 6 or 6:30 p.m. and did not leave his second-floor apartment again. He took a bath and played dominos with Ramero Aguilar, his cousin. Jose Lopez and Roberto Sanchez joined them from about 7:30 p.m. to 9:30 p.m. When defendant and Ramero were playing dominos at about 9:45 or 10 p.m., R.M. came in with her sister and a young man. The visitors "were asking for something, but we didn't know what it was," as the visitors spoke only in English. Defendant denied speaking to anyone in English. After 5 to 10 minutes, the visitors left. He had never seen them before that encounter.

¶ 23    Defendant and Ramero watched television until about 10:30 p.m., when the police knocked on the door and ordered them in Spanish to come outside. Eight to ten men gathered on

the porch. Although defendant initially testified that everyone was on the porch because it was a warm night, he subsequently testified that the police had ordered him to come downstairs. Both R.M. and Michelle pointed to him, but he did not know what was being said because they spoke in English. Furthermore, both he and Ramero were arrested.

¶ 24    Ramero testified that on the day in question, he and defendant went to work together, came home together at about 6 p.m. or 6:30 p.m., and then played dominos together. Lopez and Sanchez joined them later. Between 9:30 and 10 p.m., two women and a man arrived. Ramero did not understand their questions. Additionally, Jorge Orozco, who spoke a little English, came upstairs when the visitors arrived. After the visitors left, Ramero and defendant played dominos and watched television until about 10:30 p.m. The police then knocked on the door and asked everyone in the house to come outside. Michelle pointed out Ramero and defendant, who were arrested. The police released Ramero after 24 hours, however.

¶ 25    Orozco testified that at about 9:30 or 9:45 p.m. on June 13, 1989, he went upstairs because two girls and a white male arrived and spoke loudly. Orozco, who spoke a little English, testified that those individuals were looking for a man, but they never asked about defendant or Ramero. After 8 to 10 minutes, the visitors left, and Orozco returned downstairs. At about 10:30 p.m., the police ordered everyone to come outside. The police, accompanied by the girls who had been there earlier, were looking for a particular man.

¶ 26    Lopez testified that on the day in question, he arrived home at about 6:30 p.m., saw defendant and Ramero upstairs at about 7 p.m., and played dominos with them until 9:30 p.m. On his way back downstairs, he saw two females and a male. At about 10:30 p.m., the police knocked on the door and ordered everyone to come outside.

¶ 27    At the close of evidence, the trial court indicated it was troubled because the State charged defendant as a principal, rather than as an accomplice, but the evidence did not show he inserted his penis into R.M.'s vagina. The court gave the State time to show that defendant could nonetheless be found guilty under an accountability theory.

¶ 28    On May 13, 1991, the trial court found defendant guilty under an accountability theory and admonished him that he could be sentenced in his absence if he did not return to court.[2] The record does not indicate that an interpreter was present at that time. In addition, defendant failed to appear on subsequent court dates. On June 21, 1991, Del Valle told the court that defendant's relatives said that he went to Mexico out of fear of going to prison. Following argument, the court denied defendant's motion for a new trial. At sentencing, Del Valle stated that defendant was innocent and had told him, "'I am not going to stick around for something I didn't do.'" The court then sentenced defendant to 30 years in prison for aggravated criminal sexual assault and found the remaining counts merged.

¶ 29                                  II. Analysis

¶ 30                          A. Sufficiency of the Evidence

¶ 31    On appeal, defendant first asserts that the State failed to prove him guilty of aggravated criminal sexual assault beyond a reasonable doubt because the testimony of R.M., the only link between defendant and this offense, was inconsistent and unreliable. Defendant argues that she did not positively identify him as having been involved in the offense.

¶ 32    Initially, the State argues that defendant forfeited the right to challenge R.M.'s competency to testify when defense counsel stated he was satisfied that she was competent. See *People v. Williams*, 383 Ill. App. 3d 596, 634 (2008). It is equally true, however, that

_____

[2] Del Valle argued that not only was defendant innocent, but Del Valle himself would testify against the perpetrator, as Del Valle knew who it was.

challenges to the sufficiency of the evidence are not subject to forfeiture and may be raised for the first time on appeal. *People v. Lucas*, 231 Ill. 2d 169, 175 (2008). Accordingly, we may consider the reliability and sufficiency of R.M.'s testimony. See *Williams*, 383 Ill. App. 3d at 634, 637-38 (finding that while the 9 and 11-year-old witnesses were deemed competent, their testimony was nonetheless unreliable and too tenuous to sustain the defendant's conviction where said testimony was hesitant, vague, riddled with internal inconsistencies and resulted from vigorous leading questions).

¶ 33    To prove criminal sexual assault, the State must show that the defendant committed "an act of sexual penetration by the use of force or threat of force." Ill. Rev. Stat. 1989, ch. 38, ¶ 12-13(a)(1); see also 720 ILCS 5/11-1.10(a)(1) (West 2018). The offense becomes aggravated criminal sexual assault if the defendant also "caused bodily harm to the victim." Ill. Rev. Stat. 1989, ch. 38, para. 12-14(a)(2); see also 720 ILCS 5/11-1.30(a)(2) (West 2018). In addition, the accountability statute states that "[a] person is legally accountable for the conduct of another when *** [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid such other person in the planning or commission of the offense." Ill. Rev. Stat. 1989, ch. 38, par. 5-2(c); see also 720 ILCS 5/5-2 (West 2018); see also *People v. Dunbar*, 2018 IL App (3d) 150674, ¶ 26 (stating in the context of a sufficiency of the evidence claim that while the inclusion of accountability language in a charging instrument puts a defendant on notice that the State may attempt to prove his guilt based on accountability, such language is not required).

¶ 34    When reviewing the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense satisfied beyond a reasonable doubt.

9

*People v. Brand*, 2021 IL 125945, ¶ 58. Our supreme court has consistently held that a single witness is sufficient "*if* the testimony is positive and credible, even if it is contradicted by the defendant." (Emphasis added.) *People v. Harris*, 2018 IL 125124, ¶ 27. In weighing a witness's identification testimony, courts consider (1) the witness's opportunity to view the criminal during the crime; (2) her degree of attention; (3) the accuracy of her prior description; (4) the level of her certainty at the confrontation; and (5) the length of time between the crime and the confrontation. *People v. Piatkowski*, 225 Ill. 2d 551, 571 (2007).

¶ 35    The trier of fact is entitled to determine the credibility of the witnesses, resolve conflicts in the evidence and draw reasonable inferences therefrom. *People v. Jackson*, 2020 IL 124112, ¶ 64.  In addition, we must give the trier of fact's credibility determinations great weight and draw all reasonable inferences in favor of the judgment. *People v. Swenson*, 2020 IL 124688, ¶¶ 35, 36. We will not set aside a criminal conviction due to a lack of evidence unless the evidence is so unsatisfactory or improbable as to create a reasonable doubt of the defendant's guilt. *Jackson*, 2020 IL 124112, ¶ 64. Yet, evidence showing that the defendant is "probably" guilty falls short. *People v. Ehlert*, 211 Ill. 2d 192, 213 (2004).

¶ 36    Here, R.M.'s testimony did not constitute a positive, credible identification of defendant as an offender in this case. R.M. testified both that one person was involved and that several people were involved. If only one person was involved, R.M.'s testimony shows it was not defendant, as she clearly testified that he did not hump her. In addition, R.M. testified that defendant held her arms down during the attack but then testified that she did not encounter defendant until after the attack. Contrary to the State's suggestion that R.M.'s testimony was consistent, these were material inconsistencies.

¶ 37    R.M. indisputably was a victim of a sexual assault. Yet, the record strongly indicates that she was either confused as to the nature of the questions being asked or unable to accurately convey her answers. Presuming that R.M. was competent to testify, we acknowledge that the evidence may have looked somewhat different had the attorneys or the trial court taken pains to clarify R.M.'s meaning. As it stands, however, we cannot agree that R.M. *positively* identified defendant as an offender in this case. Furthermore, the mere ability to observe R.M. in the courtroom could not have provided a meaningful basis from which to resolve the inconsistencies in R.M.'s testimony, notwithstanding the general presumption that the trier of fact is in a superior position to assess a witness's credibility. *Jackson*, 2020 IL 124112, ¶ 69.

¶ 38    Michelle's testimony did little to clarify matters. Michelle testified that upstairs in defendant's apartment, she and R.M. were looking for just one individual, the man who humped her, and at that point, R.M. had not said that anyone had held her arms down. While victims may respond differently upon seeing their perpetrators, it is undisputed that R.M. did not identify defendant for Michelle when she saw him, and we note there is no suggestion that R.M. otherwise reacted to defendant's presence. Additionally, we question why Michelle and R.M. would have looked for the offender(s) in the upstairs apartment when, according to R.M., the offense occurred downstairs. Moreover, at one point, R.M. testified that Michelle had pointed defendant out to R.M. rather than the reverse.

¶ 39    Detective De Falco's testimony is problematic as well. According to the detective, R.M. said defendant held her arms down. Similar to R.M.'s testimony, however, Detective De Falco provided little information regarding the conditions in which R.M. identified defendant on the porch. The record is virtually silent as to many of the factors pertinent to assessing the reliability of a witness's identification. In addition, R.M.'s identification of defendant's cousin, which the

State does not dispute was incorrect, suggests that either the conditions on the porch were not suitable for making an identification or that R.M.'s communication difficulties distorted the significance of what she was being asked or what she was trying to convey. Detective De Falco's testimony provides no basis from which anyone could reasonably conclude that R.M.'s identification of the very two people she had just seen upstairs was merely coincidental. See *People v. Cunningham*, 211 Ill. 2d 278, 283 (2004) (recognizing that while the trier of fact's role is to judge how testimonial flaws effect a witness's credibility, the trier of fact's judgment must be reasonable in light of the entire record and, in some cases, reviewing courts may find that "flaws in testimony made it impossible for any fact finder reasonably to accept any part of it"); see also *People v. Reyes*, 265 Ill. App. 3d 985, 989 (1993) (noting that the only evidence contradicting the defendant's testimony that he did not participate in a group beating was the testimony of two witnesses who later disavowed their statements and that those statements were "one word responses to the prosecutor's leading question" rather than detailed accounts).

¶ 40    We are compelled to find that while the evidence was sufficient to demonstrate that R.M. was assaulted, the evidence was not sufficient to show that defendant was an offender in this case. We sympathize with R.M. and her family. Justice will not be done, however, by affirming a conviction built upon insufficient evidence or denying defendant his right to due process.

¶ 41                                III. Conclusion

¶ 42    Here, the evidence was insufficient to sustain defendant's conviction for aggravated criminal sexual assault. Accordingly, we reverse the trial court's judgment. In light of our determination, we need not consider defendant's remaining contentions.

¶ 43    For the foregoing reasons, we reverse the trial court's judgment. We direct the clerk of the court to issue the mandate in this case *instanter*.

¶ 44    Reversed.