2025 IL App (1st) 232356-U

No. 1-23-2356

Order filed March 26, 2025

THIRD DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | No. 23 DV 70842 01 |
| v. | ) ) | Honorable |
| ELVIS JACKSON, | ) ) | Jeanne Marie Wrenn, Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Lampkin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The evidence presented at trial was sufficient to sustain defendant's convictions and to overcome the affirmative defenses raised. Affirmed.

¶ 2       Defendant Elvis Jackson was charged with two counts of domestic battery resulting from a March 24, 2023 altercation between him and his cousin, Patricia Perry (Patricia). After a bench trial, defendant was found guilty of both counts and sentenced to 18 months of probation. Defendant was ordered to complete domestic violence classes and receive counseling as a

condition of his probation. The circuit court additionally granted Patricia a one-year order of protection. Defendant argues on appeal that the circuit court erred 1) because Patricia, upon whose testimony his conviction depended, was not a credible witness and 2) because the State failed to sufficiently disprove defendant's affirmative defenses.

¶ 3                                    I. BACKGROUND

¶ 4        The March 24, 2023 altercation at the center of this case occurred between 65-year-old defendant and his 69-year-old cousin, Patricia, in the basement of the home belonging to defendant's elderly parents, Otto and Mary. Defendant lived in the home, along with his wife, with whom he shared a bedroom in the basement. Patricia had been working as a home care professional taking care of 91-year-old Otto since April 2021 and visited the home three days a week between 10 a.m. and 2 p.m. Both parties agree that defendant was in the kitchen on the first floor of the home cooking breakfast for himself and his wife when Patricia arrived and was let in by Mary. From that point, Patricia and defendant's testimony diverge significantly.

¶ 5        Patricia testified that when she entered the kitchen she observed defendant and Mary having a loud conversation while defendant cooked breakfast for himself and his wife. During the conversation, which was about an incident that occurred the prior night, defendant raised his voice. Defendant went to the basement with the food he had cooked. Patricia intended to cook breakfast for Mary and Otto, but found that there was no food in the refrigerator. She asked Mary if she should go get the remaining sausages from downstairs that defendant had not cooked. Based on that conversation, Patricia went to the basement and retrieved the sausages from the freezer.

¶ 6        Patricia did not see defendant when she entered the basement, but upon starting back upstairs, she heard him say "put my mother fucking sausage down you bitch." Patricia saw

defendant standing six or seven feet away. She started up the stairs and defendant grabbed her from behind with his arms around her chest. Patricia testified that defendant repeated his demand while holding her tightly enough that she could not move. She thought she may have told him to take his hands off her two or three times, but he only released her after Mary arrived at the top of the stairs and called down to him to let Patricia go. After he let go, defendant punched Patricia in the back of the neck with a closed fist. Patricia turned around and hit him back. Defendant fell into some clutter in the crowded basement.

¶ 7     At some point during the struggle, the sausage ended up on the floor. Defendant demanded: "Pick up my mother fucking sausage you bitch." Patricia moved to continue up the stairs, at which point defendant "grabbed [Patricia's] clothing from the back of [her] neck and pulled [her] down the stairs." Patricia thought she had gotten "[a]bout three, maybe four" steps up the steep staircase before she was pulled down. She attempted to grab the wall for support, but he continued to pull steadily until she lost her balance and fell backward, where her "whole body hit the concrete." As a result of the fall, Patricia scraped her cheek on the stone wall and hit the back of her head on the concrete floor. After lying on the floor for several seconds "dazed," Patricia saw defendant standing nearby with a stick. Patricia retrieved her phone from her pocket, called 911, and returned upstairs.

¶ 8     Patricia spoke with police once they arrived and showed them her injuries. She declined medical treatment because she did not want to go to the nearest hospital, but did later go to another hospital. The State introduced photographs allegedly depicting the swelling on Patricia's face, as well as multiple bruises and a bump on her left arm.

¶ 9     On cross-examination, Patricia acknowledged that she did not know who owned the sausages, but that they were not hers. She also stated that she knew that defendant kept his

food in the downstairs freezer, but as far as she was aware, it was where the family as a whole kept some of their food. Patricia confirmed that she verbally refused when defendant directed her to put the sausages down. Patricia confirmed that she told police that she had been punched in the back of the neck. When asked whether she had instead told police that she was punched in the chest, Patricia stated that she was also punched in the chest after she hit him. Patricia stated that she was on the second step at least, perhaps as high as the fourth when she was pulled back down. On redirect examination, Patricia stated that, in the time she had worked as Otto's caretaker, she had been to the basement freezer on previous occasions.

¶ 10        Officer Richard Klein of the Chicago Police Department testified that he and his partner responded to the domestic disturbance call that resulted from the altercation between Patricia and defendant. Officer Klein recalled observing redness and bruising on Patricia's left arm and swelling on her upper cheek near her eye. He also stated that Patricia was initially interested in medical treatment, but was concerned over the cost and ultimately refused medical treatment. On cross-examination, Officer Klein confirmed that he was trained to carefully observe all injuries on a victim's body when responding to a domestic violence call and that the aforementioned injuries were the only injuries he observed.

¶ 11        At the close of the State's case, defendant moved for a directed finding based on the affirmative defense theories of defense of property and defense of person, stating that Patricia entered defendant's living space, which was beyond the area where her job duties would take her, and took his personal property from the freezer in his living space. The State argued in response that based on the pictures and testimony, there was nothing to indicate that defendant had any entitlement to the basement as a whole rather than just the room in the basement where he slept. Furthermore, Patricia was directed by the homeowner to enter the basement and

retrieve the sausages. The circuit court, taking the evidence presented in the light most favorable to the nonmovant, denied the motion.

¶ 12    Defendant testified on his own behalf. He stated that he and his parents all lived on the same level of the home, but he kept all of his things in the basement and slept there. Defendant's parents slept upstairs and kept their things upstairs, but kept some clothing in the basement. Defendant stated that on the morning in question, he was in the kitchen alone cooking breakfast for himself and his wife, while his parents were in the front room. As defendant was heading downstairs with the food he had cooked, Mary and Patricia entered the kitchen. Defendant proceeded downstairs to his room, but soon returned to the main basement area, where he saw Patricia coming down the stairs and opening the freezer.

¶ 13    Defendant asked Patricia what she was doing and, upon seeing her take the box of sausages from the freezer, asked her to put it back. Patricia responded, "I'm not going putting [*sic*] anything back." Defendant said, "I bought that. Will you please put it back? You know, you don't ask anything, [*sic*] you just come and take someone's food without asking?" Defendant walked over to Patricia, put his hand on the box of sausages she was holding, and said to Patricia, "Will you please let go?" Defendant stated that he did not touch Patricia at all and was only holding the box of sausages with both hands while Patricia was pulling at the box. The box tore and the sausages scattered across the floor. Defendant told Patricia she was stupid and asked her, "Will you please pick it up?" Patricia responded that she was not going to pick anything up.

¶ 14    When asked what he did when Patricia refused to pick up the sausages, defendant stated, "I was holding her by her shirttail at the bottom of the shirt," but denied touching her body at all. Defendant clarified that the two were still standing at the freezer when he began holding

5

onto her shirttail. Patricia walked to the stairs with defendant following along holding her shirttail and, upon stepping up onto the first stair, turned and punched defendant under his eye. Defendant fell back and unintentionally pulled Patricia back with him such that she fell on top of him. After the fall, Patricia "rolled over and hit the floor." Patricia got up first and went upstairs. Defendant called the police, but did not wait around for them to arrive because he had to leave for work. Defendant suffered injury to his shoulder and swelling on his face, but did not document the injuries because he did not expect anything to come of the incident.

¶ 15    On cross-examination, defendant testified that his mother called him while he was at work, asking where he was. The following colloquy took place regarding defendant's call to the police and their visit to his home:

"Q: So let's say you came home, you knew the police had been there, right? Right?"

A: Yeah, if the police was there, I didn't have no reason to talk to them.

Q: Wait. You said you had no reason to talk to the police, correct?

A: Not at that moment when I came home because they wasn't going to be there no way."

* * *

Q: So, I'm sorry, you said you called the police that day and made a report but you had no reason to stay there for the police, is that what you're saying? You called the police, but then you said you had no reason to stay there for the police?

A: I didn't tell the police everything as what she told them.

Q: Right, she told them everything.

A: Yeah. Well, she told a lie."

¶ 16 Defendant asserted on multiple occasions that he called 311 to make a police report immediately after the incident, but also expressed uncertainty as to which day he had called to make the police report. Defendant stated that he had a copy of the police report, but did not have it with him in court.

¶ 17 Defendant denied being angry with Patricia during the altercation, stating that he was only disappointed. When asked whether it was "naturally the proper reaction" to begin tugging at the sausage box with his cousin with whom he had never had any previous issues, defendant said, "No, I don't have nothing really to tug for. I just asked her 'Man, would you please release my food?' " When asked whether he did in fact grab the box and struggle over it with her, defendant replied that he "held [onto his] sausage" but did not have to struggle over it. He "just – really just touched [his] food and put [his] hand on [his] box of sausage." Defendant testified that he kindly asked, "Please put it back?" and was not angry, only disappointed.

¶ 18 After hearing closing arguments, the circuit court found defendant guilty of both counts of domestic battery, one of which was based on defendant making insulting or provoking contact with Patricia and the other of which was based on bodily harm inflicted on Patricia. The court sentenced defendant to 18 months of probation, ordered him to attend a domestic violence class and counseling, and granted Patricia an order of protection forbidding defendant from contacting Patricia or going to her home.

¶ 19                                    II. ANALYSIS

¶ 20 Defendant asserts on appeal that 1) the State failed to prove that defendant battered Patricia because Patricia's testimony was the only evidence establishing that fact and Patricia was not a credible witness; and 2) that the State failed to uphold its burden to overcome the affirmative defenses of defense of property and defense of person raised by defendant.

¶ 21    Defendant was charged with two counts of domestic battery, which is defined as follows:

"A person commits domestic battery if he or she knowingly without legal justification by any means:

(1) Causes bodily harm to any family or household member;

(2) Makes physical contact of an insulting or provoking nature with any family or household member." 720 ILCS 5/12-3.2(a) (West 2022).

¶ 22    Defendant raised the affirmative defenses of defense of property and defense of person, which are defined as follows:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's trespass on or other tortious or criminal interference with either real property (other than a dwelling) or personal property, lawfully in his possession or in the possession of another who is a member of his immediate family or household or of a person whose property he has a legal duty to protect." 720 ILCS 5/7-3(a) (West 2022).

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2022).

¶ 23                        A. Sufficiency of the Evidence

¶ 24    Defendant argues on appeal that Patricia was not a credible witness and therefore the State did not present adequate evidence to establish the necessary elements of the charged offenses. As the evidence below consisted almost entirely of Patricia and defendant's respective accounts of the altercation, defendant's conviction certainly relies on the court's credibility findings.

¶ 25    When presented with a sufficiency of the evidence claim, this court "does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence." *People v. Wright*, 2017 IL 119561, ¶ 70. While the circuit court's factual findings are not binding upon this court, they are owed great deference, as it was the circuit court that had the opportunity to hear and see the witnesses testify live in open court, while we are afforded only a transcript. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Our task is to determine "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original) *Id.* "A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." Furthermore, "[t]he credible testimony of a single witness, even if contradicted by the defendant, is sufficient to convict a defendant." *People v. Sauls*, 2022 IL 127732, ¶ 52.

¶ 26    Defendant argues that the photographs of Patricia's injuries do not match her testimony. Defendant also alleges an inconsistency between Patricia's testimony on direct examination that she was punched in the back of the neck and Patricia's later statement, on cross-examination, that she was punched in the chest during her struggle with defendant. The circuit court explicitly stated that it found Patricia's testimony to be "far more credible" than defendant's. The circuit court also noted that the testimony of Officer Klein and the photographic evidence both corroborated Patricia's testimony. There was no dispute that defendant and Patricia are related by blood. Patricia's testimony established the other necessary elements of domestic battery: that defendant made physical contact of an insulting or

provoking nature and that defendant caused bodily harm to Patricia. The court called portions of defendant's version of events "absurd" and "unbelievable," and noted that it left many unanswered questions. Accordingly, we can only find error on the part of the circuit court if Patricia's testimony rose to the level of "unreasonable, improbable, or unsatisfactory" enough that a reasonable trier of fact could not credit any part of it.

¶ 27   The cases defendant uses to support his argument that no reasonable trier of fact could find Patricia's testimony credible present scenarios in which the witnesses in question were far more thoroughly impeached and less credible than Patricia. In *Williams*, the alleged victim of a kidnapping identified a photograph of a basement after claiming that the duct tape covering his eyes came off at one point, then later contradicted himself and stated that the duct tape had never come off. *People v. Williams*, 383 Ill. App. 3d 596, 639-40 (2008). The *Williams* victim also identified certain items that were in the basement, but when asked how he could have identified them if his eyes were covered, he "first became unresponsive, then stated that police showed him photographs of the items," only to later say his eyes were "only taped a little bit." *Id*. at 640. When asked if he recognized anyone in the courtroom who was present during the kidnapping, the *Williams* victim said no, denied being frightened to make an identification, confirmed that he had looked at everyone in the courtroom, and again denied seeing anyone he recognized from the kidnapping. *Id.* at 640-41. He later changed course and identified defendant after being asked three more leading questions about whether he saw the defendant, identified by name, in the courtroom. *Id*. The inconsistencies in *Williams* are clearly not comparable to those allegedly present in Patricia's testimony. Other cases cited by defendant present similarly problematic credibility findings that far outweigh any presented in this case. *People v. Herman*, 407 Ill. App. 3d 688, 708 (2011) (circuit court's credibility findings based

on an unreasonable inference and a misstatement of the facts); *People v. Shaw*, 2015 IL App (1st) 123157, ¶¶ 23-30 (video evidence directly contradicted victim's account and victim's testimony was further riddled with small inconsistencies).

¶ 28    When compared against the cases cited by defendant, it is evident that the alleged inconsistencies in Patricia's testimony do not rise to the level of "unreasonable, improbable, or unsatisfactory" necessary to warrant setting aside credibility findings made by a court situated in a superior position to observe the testifying witnesses' demeanors, tones of voice, and even relative physical size. Defendant argues that Patricia's testimony is inconsistent with the photographic evidence of her injuries, but those arguments are about the correct inference to be made, which is not within the scope of our review. Beyond that, the primary inconsistency that defendant indicates is that Patricia initially testified that she was struck in the back of the neck, but later stated that she was struck in the chest. However, Patricia's testimony was never that the *only* blow to her body was to the back of her neck, only that the next thing that happened after defendant let go of her was that she was struck in the back of the neck. Patricia described her pushing defendant and him falling back, but that description of events does not preclude a strike to the chest somewhere during that period of time. As such, the inconsistency of Patricia's testimony alleged by defendant does not constitute an explicit contradiction. Patricia offered information on cross-examination which was not offered in response to a different question on direct examination. This inconsistency is not enough to render Patricia's testimony so unbelievable that it was unreasonable for the court to credit any part of it. As such, the evidence presented below was sufficient to sustain defendant's convictions.

¶ 29    B. Affirmative Defenses

11

¶ 30    Defendant also argues that he properly raised the affirmative defenses of defense of self and defense of property, and that the State failed to prove beyond a reasonable doubt that neither of these affirmative defenses applied to the facts presented to the court.

¶ 31    Looking first at the matter of self-defense, neither Patricia nor defendant's version of the story establishes the necessary criteria for self-defense. A self-defense claim must include some evidence that "(1) force [was] threatened against a person; (2) the person threatened [was] not the aggressor; (3) the danger of harm [was] imminent; (4) the person threatened must actually [have believed] (a) that a danger [existed], (b) the use of force [was] necessary to avert the danger, and (c) the kind and amount of force which he [used] is necessary; and (5) the above beliefs [were] reasonable." *People v. Anderson*, 234 Ill. App. 3d 899, 906 (1992); see also *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995). In Patricia's version of events, defendant was the aggressor at every turn. This is sufficient to disprove element two and defeat defendant's self-defense claim. In defendant's version, he and defendant were struggling over the box of sausages without any further contact, defendant grabbed Patricia's shirttail, Patricia turned and punched him, he fell backward, and he *accidentally* dragged her down with him. This sufficiently disproves that defendant believed that the use of force was necessary, given that his use of force was accidental by his own account. Since the evidence does not support the self-defense theory whatsoever, we cannot say that the circuit court erred in finding that the State defeated his claim of self-defense.

¶ 32    Defendant also asserted an affirmative defense of defense of property. Where one believes that his personal property is in "immediate danger of unlawful trespass or carrying away" and "that the use of force is necessary to avoid this danger," one may use force, but "may not use more than reasonable force." *People v. Grabow*, 2022 IL App (2d) 210151, ¶ 23. Defendant's

12

argument on this point again relies on the assertion that Patricia's testimony cannot be credited, but, as we have explained above, we disagree with that premise. Viewing the evidence in the light most favorable to the State, the use of force in question consists of defendant grabbing 69-year-old Patricia around the chest, punching Patricia in the back of the neck and in the chest, and pulling Patricia by her clothing down several stairs onto a concrete floor. We can see no way to justify this as *reasonable* force to secure one's box of sausages. Even if we were to disregard the value of the item, defendant had no need to apply such a degree of force when Patricia was on the stairs and had not even reached the kitchen, where the real threat of Patricia cooking the sausages lay. More importantly, taking Patricia's version of the story as true, defendant's decision to pull Patricia down the stairs came after she had fully relinquished possession of the sausages to the floor. Whether one interprets that as the destruction of the sausages or not, there was certainly no longer any need to secure the sausages from Patricia's intent to cook breakfast for defendant's parents. As such, we find no error in the circuit court's conclusion that the State successfully defeated defendant's assertion of defense of property.

### III. CONCLUSION

¶ 33    For the foregoing reasons, we affirm the circuit court's order.

¶ 34    Affirmed.